THE STATE OF OHIO, APPELLANT, *v.* MCDANIEL, APPELLEE. ▮
THE STATE OF OHIO, APPELLANT, *v.* MCDOWELL, APPELLEE. ▮
THE STATE OF OHIO, APPELLANT, *v.* SCHULTZ, APPELLEE. ▮
THE STATE OF OHIO, APPELLANT, *v.* BLUNK, APPELLEE. ▮
THE STATE OF OHIO, APPELLANT, *v.* HORVATH, APPELLEE. ▮
THE STATE OF OHIO, APPELLANT, *v.* VOLGER, APPELLEE. ▮

[Cite as State v. McDaniel (1975), 44 Ohio App. 2d 163.]

164

(Nos. 74AP-599, 74AP-600, 74AP-601, 74AP-602, 74AP-603 and 74AP-604—Decided May 1, 1975.)

*Mr. James J. Hughes, Jr.*, city attorney, *Mr. Daniel. W. Johnson*, city prosecutor, and *Mr. H. Ritchey Hollenbaugh*, for appellant.

*Ms. Carolyn A. Watts*, Legal Aid and Defender Society, and *Mr. William O. Carse*, for appellees Marilee Virginia McDaniel and Linda Louise McDowell.

*Mr. R. Raymond Twohig*, for appellees Elizabeth I. Schultz, Linda Lou Blunk, Ilse I. Horvath, and Maria Margaret Volger.

WHITESIDE, J. The state appeals from a judgment of the Franklin County Municipal Court sustaining motions to suppress in each of these six cases, which were consolidated in the trial court and again on appeal. Pursuant to R. C. 2945.68 and 2945.70, Crim. R. 12(J), and *State* v. *Hughes* (1975), 41 Ohio St. 2d 208, this court grants a review in these cases, finding the allowance of an appeal by the prosecution to be in the interest of justice.

All six defendants were arrested and charged with shoplifting in a large Columbus department store, Lazarus. Each of the defendants was surreptitiously observed by Lazarus security employees while in fitting rooms in the department store. The Lazarus security staff consists of about 45 full-time employees, 80 percent of whom are commissioned as special deputy sheriffs of Franklin County. These special deputy commissions issued by the sheriff, although purporting to bestow the same authority to arrest as any other deputy sheriff, are limited on their face to Lazarus security problems. There is no notice posted in the department store which warns customers disrobing in-

side the fitting rooms that they may be observed by Lazarus security personnel.

Fitting areas are separated from the shopping areas by a curtain, and, within the fitting areas, there are individual fitting booths. Each booth has side partitions and a front curtain. Most partitions do not reach fully to the floor, some leaving as much as an 18-inch gap. Some of the curtains do not close completely. The partitions and curtains, while extending above the head and reach of the customers, do not reach the ceiling.

The specific arrests of defendants resulted from their observation by three different security personnel. One security officer observed four of the defendants, Schultz, Blunk, Horvath, and Volger. The remaining two defendants, McDaniel and McDowell, were separately observed by different security personnel of Lazarus. The security employee observing defendant McDowell was a commissioned special deputy sheriff; the other two security employees observing the other five defendants were not.

The security employee observing defendant McDowell did so by getting down on her knees, behind a chair, in the next fitting room to that in which McDowell was located. The security employee then observed what McDowell was doing by looking under the partition into the mirror in McDowell's fitting room. McDowell was observed concealing merchandise in her handbag. The security employee observed McDowell for approximately 20 minutes in the shopping area before following her into the fitting room area. While in the shopping area, McDowell exhibited mannerisms which caused the security employee to suspect that McDowell was going to attempt to shoplift. Basically, the mannerism consisted of looking around as if to determine if anyone was watching.

In the other five cases, the defendants were observed by a security officer who went into a vacant fitting room used as a storeroom, climbed up on shelves, removed a ceiling tile, and looked down into the fitting room area so that she could observe not only the fitting room in which the suspect was, but also the other fitting rooms as well.

This technique enabled one of the security employees not only to observe shoplifting on the part of the defendant she suspected, Schultz, but also on the part of three other defendants the security employee had no previous reason to suspect; namely, defendants Blunk, Volger, and Horvath.

The testimony of the security personnel as to the activities of defendants Schultz, McDaniel, and McDowell that caused the employees to suspect those defendants were planning to shoplift is somewhat sketchy. Basically, the mannerisms of the defendants consisted of the method of looking around as if to see if anyone was watching, and the way in which they carried merchandise.

There was testimony that about fifty percent of the instances in which security employees surreptitiously observe customers in fitting rooms result in a discovery of shoplifting. However, the security employee observing defendant McDowell testified that 90 percent of the customers exhibiting the mannerisms exhibited by McDowell end up shoplifting. The security employee observing defendant McDaniel testified in this regard:

"* * * Sometimes a person that you think looks suspicious—sometimes you will have a lot of luck and maybe 50 percent of them will take something.

"Sometimes your leads and when you think they may look good, you can be completely wrong. * * *

"I would say when we follow them in the fitting room, our probable cause to follow them in, I would say the ones that we think they really look good, I would say 50 percent of the times are right."

The trial court sustained motions in all six cases to suppress the evidence obtained by the surreptitious observation of the defendants in the Lazarus fitting rooms, finding such observation to be an invasion of the privacy of defendants and to constitute an unreasonable search in violation of constitutional prohibitions. The state, in support of its appeals, does not set forth assignments of error but, rather, sets forth two propositions of law, which we shall treat as assignments of error. They read as follows:

1. "Where the testimony adduced at the hearing on

the motion to suppress evidence in a shoplifting case clearly shows that in the women's fitting room area of a large department store any female, customer or otherwise, is free to walk into any individual fitting room with no restraint, that the curtains on the fitting rooms do not extend to the floor and do not close completely, that the side partitions on each fitting room do not extend to the floor or to the ceiling, and that anyone wishing to do so is free to look under or over the partitions, that testimony is sufficient to allow a finding that a person using the fitting rooms would have no reasonable expectation of privacy or freedom from intrusion under the Fourth Amendment of the United States Constitution.''

2. ''Even if the court finds there is a reasonable expectation of freedom from intrusion in a department store fitting room, evidence obtained by a store employee through observation of a defendant in a fitting room, when the employee in observing that individual defendant was not acting at the direction of a police official but on his own initiative, should not be held inadmissible in the prosecution of that defendant since there is no state action involved.''

In support of the first assignment of error, the state contends that any customer who uses a fitting room, such as herein involved, in a large department store is aware of the lack of privacy which necessarily exists in the fitting room area. The state points out that some of the fitting room curtains do not close completely, that one customer may inadvertently walk in on another customer in some stage of undress in a fitting room, that children accompanying their mother may wander into the wrong fitting room or peer under the partitions, and that salesclerks may enter the fitting room either to see whether it is occupied or to assist the customer.

These contentions, even if we are to consider them without specific evidence thereon, do not establish a lack of a reasonable expectancy of privacy by a person using the fitting room in the department store. In *Katz* v. *United States* (1967), 389 U. S. 347, it is stated, at page 351:

''Because of the misleading way the issues have been

formulated, the parties have attached great significance to the characterization of the telephone booth from which the petitioner placed his calls. The petitioner has strenuously argued that the booth was a 'constitutionally protected area.' The Government has maintained with equal vigor that it was not. But this effort to decide whether or not a given 'area,' viewed in the abstract, is 'constitutionally protected' deflects attention from the problem presented by this case. For the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. * * * But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. * * *''

A customer entering a fitting room of a department store for the purpose of partially disrobing and trying on clothing and closing the door or curtain of the fitting room behind her obviously is attempting to preserve as private her conduct in the fitting room area, even though to some degree it may be accessible to the public. Even though the customer may be aware, and may be deemed to have consented, to the possible intrusion into her privacy by the inadvertence of another customer or by a salesclerk who intends to assist the customer, the customer using the fitting room has a reasonable expection that her privacy will not be invaded by an intruding eye from a concealed vantage point.

From the testimony of the Lazarus security director, it appears that the type of surveillance utilized by two of the security employees herein—observing the entire fitting room area from overhead—is not condoned, but that the other type of surveillance involved—looking under the partition between fitting rooms—is more or less routine. As to the instruction given to security employees, the security director testified:

''* * * *

''A. My instructions to them are to observe in any fitting room any view which any other customer might see going into the complex of fitting rooms, for viewing what

any person might be doing if they have had probable cause to believe—if they have come to their own feeling that they have got probable cause to believe that that person is going to steal something.

"Q. Now, do I understand your instruction to be that their view can only be that which any customer might obtain?

"A. Right. No one-way mirrors or no peepholes or anything like that.

"Q. All right. And that their view would then not be the inside of fitting rooms, would be—merely be the outside of fitting rooms?

"A. I did not say that. It would be underneath the partition, which is not a uniform thing throughout our stores, as some of the partitions are a foot and a half up from the ground, some are all the way down to the ground; some have curtains completely—could be completely closed but do not touch the ground; some of them of (sic) you pull the curtain completely closed, you couldn't close all of the doorway into that particular fitting room, individual fitting room.

"I'm saying that no special techniques or tricky one-way mirrors or peepholes or vents are—used or device for looking at somebody. It's just the—what you are confronted with at that time.

"If you have reason to believe that a person is committing a crime, if you look underneath a partition, fine. If you look through the curtain opening, fine."

This was somewhat corroborated by the testimony of one of the security employees using the overhead viewing technique of surveillance, who, with respect thereto, testified:

"Well, they really discourage it. We thought of it ourselves. I would say we have had like—it's really hard for me to say, not that many times, but we have done it."

It is quite clear from the evidence that, in five of the cases herein, the views obtained by the security employees were not views which any customer might obtain. In addition, it is highly improbable that any customer would get

down on her knees in order to observe what was going on in a fitting room adjacent to her, although it would be possible. Also, with respect to three of the six defendants, the security employee had no reason whatsoever to suspect that they were going to shoplift before the view of their activity was obtained, at the same time the one suspected defendant was observed.

We agree with the statement of the trial court that Lazarus "has created an atmosphere of privacy" with respect to the fitting rooms and that customers who use such fitting rooms rely thereon and feel secure that they are not being observed by an intruding eye from a surreptitious vantage point for whatever purpose. It must be noted that the evidence indicates that only women security employees observe the women's fitting rooms.

Neither the Fourth Amendment, as read into the Fourteenth Amendment to the United States Constitution, nor Section 14, Article I of the Ohio Constitution, create, or deal with, a general right of privacy but, rather, guarantee the right of persons "to be secure * * * against unreasonable searches and seizures." It is not every invasion of privacy that constitutes a search, reasonable or unreasonable. However, where one person surreptitiously observes another in a place where the person observed has a reasonable expectation that his actions take place in privacy unobserved by others for the sole purpose of obtaining evidence of a crime being committed by the person observed, a search is involved.

The evidence herein is sufficient to permit a finding that the defendants, while using the Lazarus fitting rooms, had a reasonable expectation of privacy or freedom from intrusion under the constitutional prohibitions of unreasonable searches. Accordingly, the first assignment of error is not well taken.

By the second assignment of error, the state contends that, even if the defendants' privacy was invaded by the Lazarus security employees, the exclusionary rule should not be applied because no state action is involved. The basic issue herein is not whether there has been an invasion of

privacy—there has been—but, rather, whether such invasion of privacy was unreasonable so as to constitute an unreasonable search, and, if so, whether the constitutional prohibition against unreasonable searches and the United States Supreme Court created exclusionary rule apply to the searches herein involved made by security employees of a large department store.

It is generally held that the constitutional right against unreasonable searches applies only to actions by the government and its officers and not to acts of private individuals. See annotation, 36 A. L. R. 3d 553; *Zupp* v. *State* (1972), 258 Ind. 625, 283 N. E. 2d 540; *Gunter* v. *State* (1971), 257 Ind. 524, 275 N. E. 2d 810; *People* v. *Horman* (1968), 22 N. Y. 2d 378, 239 N. E. 2d 625; and *City of University Heights* v. *Conley* (1969), 20 Ohio Misc. 112. In *Horman*, the New York Court of Appeals stated, at page 381, 382, 239 N. E. 2d at 627, 628:

"In *Burdeau* v. *McDowell* (256 U. S. 465) the Supreme Court (p. 475) flatly stated that the Fourth Amendment's 'origin and history clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies.' * * *.

"In *Burdeau*, however, and in the case at bar, the evidence was not seized in violation of the Federal Constitution because neither the Fourth nor Fourteenth Amendment proscribes private as opposed to governmental activity. Therefore, since the evidence in this case was seized without the participation or knowledge of any governmental official, it is admissible in a criminal prosecution. [Citations omitted.]"

Accordingly, the exclusionary rule excluding evidence illegally obtained from searches in violation of a person's constitutional right against unreasonable searches and seizures does not apply to render inadmissible evidence obtained by a private person without governmental participation, whether such evidence was obtained by such private person by a legal or illegal search. Defendants herein, however, contend that there was governmental partici-

pation in, or sanction of, the searches herein involved, conducted by Lazarus security employees. This contention is predicated upon two bases: (1) R. C. 2935.041, and (2) the fact that most of the Lazarus security employees are commissioned special deputy sheriffs.

R. C. 2935.041 provides, as follows:

"A merchant, or his employee or agent, who has probable cause for believing that items offered for sale by a mercantile establishment have been unlawfully taken by a person, may, in order to recover such items without search or undue restraint or in order to cause an arrest to be made by a police officer until a warrant can be obtained, detain such person in a reasonable manner for a reasonable length of time within the said mercantile establishment or the immediate vicinity thereof.

"Any police officer may, within a reasonable time after such alleged unlawful taking has been committed, arrest without a warrant, any person he has probable cause for believing has committed such unlawful taking in a mercantile establishment."

The New York Court of Appeals in *Horman, supra,* considered a similar statute, authorizing an arrest rather than detention, insufficient to constitute the action of the store detectives therein governmental action. Furthermore, the Supreme Court of Ohio has had occasion to consider whether the questioning of an accused shoplifter during a detention, pursuant to R. C. 2935.041, constituted custodial interrogation requiring *Miranda* warnings. In *State* v. *Bolan* (1971), 27 Ohio St. 2d 15, the Supreme Court held admissible a confession made by an alleged shoplifter, while he was being detained, pursuant to R. C. 2935.041, by an employee of a merchant, even though no *Miranda* warnings were given. In the opinion by former Justice Leach, it is stated, at page 18:

"In our opinion, the limited right of temporary detention extended to a merchant's employee by R. C. 2935.041 does not place him in the category of a 'law enforcement officer' within the purview of *Miranda.*

"Essentially this same conclusion has been reached

almost uniformly by courts of other jurisdictions. The rationale of these cases is that the duty of giving 'Miranda warnings' is limited to employees of governmental agencies whose function is to enforce law, or to those acting for such law enforcement agencies by direction of the agencies; that it does not include private citizens not directed or controlled by a law enforcement agency, even though their efforts might aid in law enforcement.''

The same reasoning necessarily applies to the identical contention made herein with respect to the constitutional prohibition against unreasonable searches and seizures. R. C. 2935.041 does not operate to make the action of a private citizen thereunder—that is, a merchant or his employee— state action within the contemplation of constitutional prohibitions. Here, we are not dealing with the security employee exercising the authority conferred by R. C. 2935.041 but, rather, are concerned with actions of the security employee prior to her determination to exercise such power. Thus, the action of the security employees herein involved are more removed from state action than those of the employee involved in *Bolan* and was not the exercise of authority granted by that section.

Defendants' second contention presents a vexing problem. In two instances, the security employees involved were not commissioned special deputy sheriffs; whereas, in the third, the security employee was a commissioned special deputy sheriff. In addition, the evidence indicates that the noncommissioned employees work in conjunction with commissioned employees, at least to the extent that the arrest, if it be found to be appropriate, is effected by a commissioned employee following detention, pursuant to R. C. 2935.041, by a noncommissioned employee.

There is no statutory authority for a sheriff to commission special deputy sheriffs, as those involved herein, such as the power to commission private policemen conferred upon the director of public safety of a city by R. C. 737.05 and that conferred upon the governor to commission bank, building and loan, and railroad police, by R. C. 4973.17. However, see *State, ex rel. Geyer,* v. *Griffin* (1946),

80 Ohio App. 447. With respect to railroad police, commissioned pursuant to R. C. 4973.17, the Supreme Court held, as follows, in the syllabus of *New York, Chicago & St. Louis Railroad Co.* v. *Fieback* (1912), 87 Ohio St. 254:

"1. A policeman who is appointed and commissioned by the Governor, under Sections 3427 and 3428, Revised Statutes (General Code, Section's 9150 and 9151), although his appointment was upon the application of a railroad company and his salary is paid by such company, is a public officer, deriving his authority directly from the state; and his acts will be presumed to have been performed in his capacity as such officer, until such presumption is overcome by sufficient evidence.

"2. A railroad company is not liable for the wrongful acts of such officer while acting by virtue of his office, unless such wrongful acts occurred in the performance of an act which was outside of the public duties of a policeman, and which was authorized or ratified by such company."

In *Pennsylvania Rd. Co.* v. *Deal* (1927), 116 Ohio St. 408, the Supreme Court, after quoting the second paragraph of the syllabus of *Fieback,* stated, at page 414 of the *per curiam* opinion:

"Applying this doctrine, we must conclude from the verdict of the jury upon the issue of fact that the officer was acting outside the public duties of a policeman, but within the scope of his employment, and that there was authority from his employer to cause the arrest in question."

From the evidence herein, it can only be concluded that the Lazarus security employees, at the times in question, were engaged in activity within the scope of their employment with Lazarus solely for the benefit of their employer, Lazarus, to detect and prevent thievery of Lazarus merchandise. They were acting outside of any public duty they might be authorized to perform as a commissioned special deputy sheriff, and only one of the employees could have acted in that respect in any event. To hold in this case that the actions of the Lazarus security employees constituted state action on their part would not only be contrary to the

realities of the situation but would constitute an unwarranted extension of constitutional provisions to apply to the activities of a corporation conducted through its employees, even though Lazarus, apparently for its own benefit, has some of such employees trained and commissioned as special deputy sheriffs.

Only Lazarus controls the conduct and activities of its security employees, whether or not commissioned as special deputy sheriffs, and there is no indication herein that the sheriff exercises any control whatsoever over the activities of such security employees. They do not perform their duties for the benefit of the public but, rather, for the benefit of Lazarus. Thus, we conclude that the activities and conduct of the security employees herein involved did not constitute state action within the contemplation of constitutional prohibitions against unreasonable searches and seizures.

With respect to the observation by the one security employee who was commissioned as a special deputy sheriff, the state concedes that her action might be said to constitute state action. However, for the reason set forth above, we conclude that, even in that instance, the employee was performing duties solely for the benefit of her employer, Lazarus, and was not performing public duties as a deputy sheriff.

This decision leaves undisturbed the trial court's finding that the searches involved were unreasonable. Had the evidence indicated that the security employees had probable cause to believe that the person being observed was going to steal something, which was the evidence as to the instructions given to the security employees, the result might be different. However, the trial court found that the security employee predicated their determination to make the covert observation upon an "educated guess" rather than probable cause. Such factual finding is supported by the evidence. The right to privacy is not absolute, and the constitution prohibits only unreasonable searches. Shoplifting is a serious problem for merchants. Merchants may utilize reasonable means to detect and prevent shoplifting.

Where the merchant, or his employee has probable or reasonable cause to believe that an apparent customer is in reality a thief planning to shoplift merchandise, the merchant, or his employee may utilize reasonable means of surveillance and observation of such person in order to detect and prevent thievery, which includes a reasonable limited invasion of the privacy of such person. However, wholesale observation of customers by invading their privacy cannot be justified, nor can such observation be properly predicated upon mere suspicion or hunch. However, for the reasons set forth above, we find the second assignment of error to be well taken since private rather than state action was involved, and the exclusionary rule does not apply.

Accordingly, the first assignment of error is overruled, and the second assignment of error is sustained, and the judgments of the Franklin County Municipal Court are reversed, and these causes are remanded to that court for further proceedings in accordance with law, consistent with this decision.

*Judgments reversed and causes remanded.*

STRAUSBAUGH, P. J., and HOLMES, J., concur.