**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Thomas E. FRANCOEUR, Robert R. Pizio and Jack Pacheco, Defendants-Appellants.**

**No. 76–1886.**

United States Court of Appeals, Fifth Circuit.

Feb. 25, 1977.

Rehearings Denied March 23, 1977.

James E. Shepherd (Court-appointed), Orlando, Fla., for Francoeur.

H. Jay Stevens (Court-appointed), Orlando, Fla., for Pizio.

Bryan C. Hugo (Court-appointed), Orlando, Fla., for Pacheco.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Harrison T. Slaughter, Jr., Asst. U. S. Atty., Orlando, Fla., for plaintiff-appellee.

Before TUTTLE, CLARK and RONEY, Circuit Judges.

TUTTLE, Circuit Judge:

This appeal of the three appellants, each on several counts of an indictment charging them with having passed counterfeit $50 bills at Disney World in Florida, and having conspired to do so, raises principally the question whether the conduct of the security personnel of the privately-operated amusement park is to be equated with, and to be given the same effect as, actions by Government officials in the application of Fourth Amendment protection.

There is no issue on this appeal as to the sufficiency of the evidence for the conviction of the three defendants. The grounds of the appeal relate to the appellants' claim that they were detained, questioned, and viewed for identification purposes in a manner which, if carried on by either state or federal officials, would have amounted to a violation of their Fourth Amendment rights.

Briefly stated, a Disney World employee alerted a Mr. Morgan to the fact that several $50 counterfeit bills had been cashed on the morning in question. Morgan promptly sought to notify various outlets for merchandise, separately run throughout the park. He personally saw a transaction in which Francoeur took an article from the China Shop at a time when he observed a $50 bill with the critical serial number lying on the counter in his immediate presence. Morgan followed Francoeur and observed him meet appellant Pacheco in what was known as the Artist's Alleyway. He followed the two on to the Main Street where they made a couple of moves that increased Morgan's suspicions, turning and retracing their steps toward the alleyway. Morgan then stopped long enough to call a Mr. Schmidt, a Walt Disney World security officer, at about which time appellant Pizio joined Pacheco and Francoeur. Schmidt followed the defendants until they reached the Train Station. There, they were stopped by Schmidt who identified himself and showed his badge (the insignia of Walt Disney World, a design of a globe with Mickey Mouse ears on top). He told them to keep their hands out of their pockets; that he wanted to talk with them; that they should not run; and that they should follow him to the Disney Security Office. Without objection, Schmidt testified at the trial at about this time, Pacheco went through some motions which Schmidt "assumed" represented an effort by Pacheco to hand a folded Disney World guidebook to Pizio but that Pizio moved away "like he didn't want to have anything to do with it."

After the three defendants were moved to a room in the Disney Security Office, Schmidt examined the Disney guidebook obtained from Pacheco and found that between the pages were nine crisp $50 counterfeit bills all with the critical serial number. He asked the three men to empty their pockets, which they did. Among the articles turned over were three Eastern Airline tickets, carbon copies dated the same day from Boston to Orlando, in the names of Kramer, Sullivan and Sousa, the names that the three men gave to the security officers when they were being questioned. Pacheco also gave up the key to Room No. 1220 in one of the hotels in the compound serving Disney World and the receipts for the payment for the room in the names of Sousa, Creamer and Sullivan.

Pacheco also had nine packets of genuine currency, each packet containing bills folded just once and each containing less than $50. Without objection, Schmidt testified: "It was in nine little packets. It was all together like if you went in and got change for a larger bill and you kept all of that change in one pocket. The stacks weren't taken out in your tens or your twenties or whatever, and put together. It was just packets of money like change from a bill."

While in custody, which we may assume for the purpose of this issue, would have amounted to forcible detention if the defendants had sought to leave over the protest of the security officials, they were placed before a one-way mirror and groups of sales persons were permitted to look at each of them individually in an effort to identify any or all of them as persons who had passed $50 bills to such sales persons during the day. Some one or other of the sales persons identified each of the three defendants as having passed such a bill or more. Thereupon, the Secret Service officials took over and filed formal charges, and obtained a search warrant for the search of the hotel room. There, or in the security office, they found a key which fit a suitcase found in the hotel room, which contained some $48,000 in counterfeit $50 bills with the same serial number.

All of the activities through the identification procedures were performed by Disney World security personnel and before special agents of the Secret Service arrived at the scene.

■ The appellants do not contest the validity of the arrest or of the issuance of the search warrant except to the extent that they were the result of the actions of the Disney World security personnel which we may assume, for the purpose of this discussion, would have violated the defendants' constitutional rights if carried out by governmental officials.

As has been recognized since *Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921) the Fourth Amendment gives protection only against unlawful governmental action. In that case, the Supreme Court said:

"The Fourth Amendment gives protection against unlawful searches and seizures, and as shown in the previous cases, its protection applies to governmental action. Its origin and history clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies; as against such authority it was the purpose of the Fourth Amendment to secure the citizen in the right of unmolested occupation of his dwelling and the possession of his property, subject to the right of seizure by process duly issued." 256 U.S. at 475, 41 S.Ct. at 576.

In *United States v. Mekjian*, we said: "Where no official of the federal government has any connection with a wrongful seizure, or any knowledge of it until after the fact, the evidence is admissible. (Citations omitted)." 505 F.2d 1320 at 1327.

This same principle has been announced in *United States of America v. Lamar & Aaron* (5th Cir. 1977), 545 F.2d 488, 490: "Thus, if a search is conducted by a private individual, for purely private reasons, it does not fall within the protective ambit of the Fourth Amendment, *United States v. Maxwell* (5th Cir. 1973), 484 F.2d 1350, 1352."

Recognizing this principle, appellants say that, nevertheless, the security personnel of Disney World in this case are in truth and in fact "government" officials. This they seek to do under some such principle as announced by the Supreme Court in *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946). In *Marsh*, the Court held that even though the town in question was totally a company-owned town, the fact that it was wide open to public access, and contained all of the necessary adjuncts and amenities of an ordinary town, a person could not be denied the right guaranteed under the First Amendment of freedom of speech on the streets of the company town. Of course, the most obvious difference between this case and *Marsh* is that Disney

World is not an open town fully accessible and available to all commerce. This private property is an amusement park to which admission is charged. Moreover, there is no showing that it has all of the facilities ordinarily identified with a community in which persons live and carry on their business. No one is permitted into the outer gates of Disney World except by consent of the owners.

If the owners of this amusement park impose in an illegal manner on their clientele, such imposition, if in violation of statutes forbidding trespass, assault, false arrest, or any other offense, would subject the owners to a civil suit on behalf of the injured person. Such illegal conduct would not, however, give them the protection of the Fourth Amendment and the exclusionary rule which has developed from it. The exclusionary rule, itself, was adopted by the courts because it was recognized that it was only by preventing the use of evidence illegally obtained by public officials that a curb should be put on over-zealous activities of such officials. The Supreme Court has in no instance indicated that it would apply the exclusionary rule to cases in which evidence has been obtained by private individuals in a manner not countenanced if they were acting for state or federal government.

We have considered the further objection that the trial court erred in not suppressing testimony of identification from the several witnesses because of what the appellants alleged to have been a suggestive presentation of photographs to the witnesses by the Secret Service agents. The trial court ruled on the evidence that the method by which several witnesses were shown the nine photographs containing those of the three defendants was "not suggestive, much less impermissibly suggestive." We do not find that determination by the trial court clearly erroneous.

The judgments are AFFIRMED.

---

*Rule 18, 5 Cir.; *see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al.,* 5 Cir., 1970, 431 F.2d 409, Part I.