UNITED STATES, Appellant,

v.

Adelaide R. LIMA, Appellee.

No. 79–502.

District of Columbia Court of Appeals.

Argued en banc June 9, 1980.

Decided Nov. 26, 1980.

John R. Fisher, Asst. U.S. Atty., Washington, D.C., for appellant.

Mozart G. Ratner and Peter J. Messitte, Washington, D.C., for appellee.

Before NEWMAN, Chief Judge, and KELLY, KERN, GALLAGHER, NEBEKER, HARRIS, MACK, FERREN and PRYOR, Associate Judges.

NEBEKER, Associate Judge:

Upon the granting of appellee's petition for a rehearing en banc, the panel decision reversing the trial court order in this case was vacated. The en banc court now reaches the same result as did the division, and reverses.

The government appeals a Superior Court ruling which granted appellee's motion for suppression of evidence (a blouse) seized by an employee of a store. It argues that the Fourth Amendment does not apply to such an employee—a guard—and that her viewing of appellee through a louvered dressing room door was not an unreasonable search. The appellee seeks to have us dismiss this appeal and the information on which the prosecution is based. She argues that a judgment awarded to her in a civil proceeding, which was based in part on a verdict of conversion of the same blouse sought to be suppressed in the criminal proceeding, collaterally estops the government from seeking to prove that she in fact stole the blouse. We hold that mere employees performing security duties are neither officials nor agents or the government. Consequently, the proscriptions of the Fourth Amendment are not applicable in the case. In addition, we conclude that the civil judgment for the appellee does not preclude the government from proving in a criminal proceeding that she stole the blouse. The appellee's motion to dismiss this appeal accordingly is denied, and the trial court order suppressing the evidence is reversed.

I

After an information was filed charging appellee with petit larceny (D.C. Code 1973, § 22–2202), a motion to suppress evidence was heard and granted by an opinion and order. The trial court found:

On November 3, 1978, Lynn Johnson was employed as a private security officer by the Lord & Taylor department store at 5225 Western Avenue, Northwest. She had been so employed since August, 1978. She was not commissioned as a special police officer pursuant to D.C. Code § 4–115 (1973), nor was she certified as a security officer as provided by law. .... She was not in uniform and she carried no weapon, although she did possess a pair of handcuffs. During the course of her employment on November 3, Johnson saw the defendant remove clothing from display racks and take it to a fitting room. After the defendant had entered the fitting room and closed the door, Johnson approached and observed the defendant through louvers in the door, as was her custom with most shoppers. As she watched, the defendant removed the tags from one of the blouses that she had taken and placed the blouse in her purse. The defendant left the fitting room, replaced several items on the display racks, and left the store. Johnson then approached her, identified herself as a "store detective" and physically restrained her. The defendant made several exculpatory statements during this encounter. The two arrived at the security office, where the defendant refused to sign a waiver of her rights to counsel and against self-incrimination. Following the refusal, the defendant made other statements. While in the office, the defendant was searched and the blouse was recovered from her purse. Approximately one hour after the "arrest", police officers arrived and took the defendant into custody.

II

While this appeal was pending, appellee successfully prosecuted a civil action against Lord & Taylor in the United States District Court for the District of Columbia. That action was based on the incident relevant here. After trial, a jury returned a verdict for the appellee which was based in part on a count for the security officer's conversion of the blouse appellee is alleged to have stolen. Judgment was entered on November 30, 1979. No appeal was taken. Appellee argues that since the ownership of the blouse was conclusively determined by the jury when it awarded her damages for conversion, the government is collaterally estopped from further litigation of the issue

of ownership. Appellee contends that since ownership of the blouse is an essential element of petit larceny, the charge cannot be proved and the case is moot. If she is correct on the issue preclusion argument, the case is indeed moot, for we are limited to deciding actual cases and controversies. *See United States v. Cummings,* D.C.App., 301 A.2d 229, 231 (1973).

The doctrine of collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot be relitigated between the same parties in any future law suit." *Harris v. Washington,* 404 U.S. 55, 56, 92 S.Ct. 183, 184, 30 L.Ed.2d 212 (1971). Collateral estoppel may apply to sequential criminal as well as sequential civil litigation. *See Turner v. Arkansas,* 407 U.S. 366, 92 S.Ct. 2096, 32 L.Ed.2d 798 (1972); *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); *Sealfon v. United States,* 332 U.S. 575, 68 S.Ct. 237, 92 L.Ed. 180 (1948).

In recent years collateral estoppel has been applied on the basis of a prior criminal conviction to a subsequent civil action. *E.g., Ross v. Lawson,* D.C.App., 395 A.2d 54 (1978) (defendant found guilty of criminal assault is estopped from contesting liability in civil action); *Palma v. Powers,* 295 F.Supp. 924 (N.D.Ill.1969) (conviction of gambling charges estopped plaintiff, in subsequent civil action for damages resulting from removal of telephones, from contesting liability for misuse of utilities).

In this appeal, however, appellee argues that an estoppel against the government, not the defendant, should result from a determination in a prior civil proceeding. Appellee reasons that a fact determined favorably in civil litigation by a preponderance of the evidence cannot be logically determined to the contrary in a subsequent criminal prosecution at a higher standard of proof. The basic problem with appellee's argument is that when, as in this case, the government is not a party in the civil proceeding, the determination of the issue will depend on a third party. There is no assurance that the government's interests will be represented. The third party might present a less than adequate defense on the issue or simply decide that the burden of defending against a charge outweighs the benefits of prevailing on the merits, and thus, abandon or concede the issue. "It is a violation of due process for a judgment to be binding on a litigant who was not a party, nor a privy, and therefore, has never had the opportunity to be heard." *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 327 n.7, 99 S.Ct. 645, 649 n.7, 58 L.Ed.2d 552 (1979). To be sure, constitutional limitations are not designed to benefit the government; however, this observation does not preclude the ordinary application of collateral estoppel to determine the issue. The government did not have a full opportunity and incentive to have the matter determined on its merits where it was not a party to the civil action. *Cf. Standefer v. United States,* 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980) (considerations of full and fair opportunity to litigate the issue barred the application of the doctrine of non-mutual collateral estoppel against the government in a prosecution for aiding and abetting where the issue had been decided in a previous prosecution of the principal of the crime); *Jackson v. District of Columbia,* D.C.App., 412 A.2d 948 (1980) (collateral estoppel may be asserted by different defendants against the same plaintiff in successive actions where the plaintiff had full and fair opportunity to litigate the issue). It had no control over the civil litigation, nor an interest in its resolution. *See Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). Preclusion from litigating the issue would thereby "deprive the state of its day in court and could present the danger of collusive civil suits instituted solely to provide a bar to prosecution." 1B Moore's Federal Practice ¶ 0.418[1] n.5 (1974) (citing Note, *Res Judicata—What Judgments are Conclusive,* 64 Harv.L.Rev. 1376, 1378 (1951)). "To forge another bar to prosecution, when the constitutional rights of the defendant are not even arguably implicated, is both unnecessary and unwise." *United States v. Standefer,* 610

F.2d 1076, 1093 (3d Cir. 1979) (en banc), *aff'd,* 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980). Accordingly, appellee's motion to dismiss is denied.

### III

As to the merits of the appeal, the trial error necessitating reversal in this case is the conclusion of law that "those who are regularly employed as retail store security guards, as was Lynn Johnson, are subject to the Fourth Amendment prohibition against unreasonable searches and seizures." [1]

 It is well established that the protection of the Fourth Amendment is applicable to intrusions of an individual's privacy interests by governmental officers and, not generally, to those made by private parties. *Coolidge v. New Hampshire,* 403 U.S. 443, 488, 91 S.Ct. 2022, 2049, 29 L.Ed.2d 564, *reh. denied,* 404 U.S. 874, 92 S.Ct. 26, 30 L.Ed.2d 120 (1971); *Burdeau v. McDowell,* 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921); *Hawkins v. United States,* D.C. App., 411 A.2d 378, 380 (1980); *Budd v. United States,* D.C.App., 350 A.2d 742, 744, *cert. denied,* 429 U.S. 840, 97 S.Ct. 113, 50 L.Ed.2d 108 (1976); *Bunter v. United States,* D.C.App., 245 A.2d 839, 842 (1968); *Moody v. United States,* D.C.Mun.App., 163 A.2d 337, 340 (1960). *But see State v. Brecht,* 157 Mont. 264, 270, 485 P.2d 47, 50–51 (1971) (the Fourth Amendment protects a person's right to privacy and is violated whether the intrusion is governmental or private). Where the private party, "in light of all the circumstances of the case must be regarded as having acted as an 'instrument' or agent of the state," the Fourth Amendment is called into play. *Coolidge v. New Hampshire, supra* at 487, 91 S.Ct. at 2049. Although a private individual may act unlawfully and violate the privacy of another, no constitutional violation has occurred absent government involvement in the intrusion.

What can constitute sufficient government involvement in a search or seizure to trigger application of the Fourth Amendment requires a case by case determination. Thus, in *United States v. Sherwin,* 539 F.2d 1 (9th Cir. 1976), seizure of allegedly obscene materials by a common carrier employee and their subsequent total transfer to the F.B.I. was viewed as the consensual transfer of objects found in a private search. The employee's search was neither subject to Fourth Amendment restrictions, nor was the government required to secure a warrant before it could "receive" these materials voluntarily given to its agents. No governmental seizure was involved. *But compare United States v. Kelly,* 529 F.2d 1365 (8th Cir. 1976), where the court suppressed allegedly obscene materials seized by the government without a warrant. Those materials were also found by a common carrier employee and the F.B.I. was alerted. However, the F.B.I. took only a portion of the materials given to them by the employee and returned to the shipping company on subsequent occasions to view and seize additional materials found by the employee.

 A private individual may become an agent or instrumentality of the state if the government is involved in the development of a plan which is later carried out by private persons, *People v. Esposito,* 37 N.Y.2d 156, 371 N.Y.S.2d 681, 332 N.E.2d 863 (1975), or stands by while a private citizen seizes the desired evidence, *Moody v. United States, supra.* This analysis has been extended by the Montana Supreme Court in *State v. Coburn,* 165 Mont. 488, 530 P.2d 442 (1974), where a store manager became an instrumentality of the police by reporting that he found marijuana in the coat pocket of one of his employees. Though the government was not then concerned with the case, they were called by the store manager and were requested to pick up what the manager had found.

---

1. Since we have resolved this case on the issue of the application of the Fourth Amendment to searches by private persons, we need not decide whether the employee's action of viewing through the louvered door constituted a search or, whether, under the circumstances, it was reasonable.

In this appeal, the evidence sought to be suppressed was seized by an employee of the Lord & Taylor department store. The employee was neither licensed as required by the Regulation Establishing Standards for Certification and Employment for Security Officers, 21 D.C.Reg. 1203 (1974), as amended by Security Officer Licensing Facilitation Act of 1977, 24 D.C. Reg. 1451 [hereinafter Regulation], nor was she commissioned as a special police officer pursuant to D.C. Code 1973, § 4–115. It is conceded that the Regulation requires the licensing of all persons employed in a position such as that occupied by Lynn Johnson. Be that as it may, Fourth Amendment restrictions cannot extend to private citizens whether or not acting in violation of a licensing regulation, for, by no fiction, could the state be deemed responsible for private action.[2] Here the employee was acting as a private individual and not as an agent or instrumentality of the state.

Searches and seizures by private security employees have traditionally been viewed as those of a private citizen and consequently not subject to Fourth Amendment proscriptions. *Wright v. United States*, D.C. App., 224 A.2d 475, 476 (1966); *accord, United States v. Francoeur*, 547 F.2d 891 (5th Cir.), *cert. denied*, 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249 (1977); *People v. Toliver*, 60 Ill.App.3d 650, 18 Ill.Dec. 54, 377 N.E.2d 207 (1978); *People v. Holloway*, 82 Mich.App. 629, 267 N.W.2d 454 (1978); *State v. Keyser*, 117 N.H. 45, 369 A.2d 224 (1977); *People v. Horman*, 22 N.Y.2d 378, 292 N.Y.S.2d 874, 239 N.E.2d 625, *cert. denied*, 393 U.S. 1057, 89 S.Ct. 698, 21 L.Ed.2d

699 (1968); *People v. LaFauci*, 91 Misc.2d 980, 398 N.Y.S.2d 981 (Dist.Ct. 1977); *People v. Santiago*, 53 Misc.2d 264, 278 N.Y. S.2d 260 (Rockland County Ct. 1967); *State v. McDaniel*, 44 Ohio App.2d 163, 337 N.E.2d 173 (1975); *cf. United States v. Antonelli*, 434 F.2d 335 (2d Cir. 1970) (private security guards not required to give *Miranda* rights). *But see People v. Zelinski*, 24 Cal.3d 357, 155 Cal.Rptr. 575, 594 P.2d 1000 (1979) (en banc) (applying art. I, § 13 of the California Constitution to unreasonable searches by security employees who are exercising their arrest and weapons search powers as enacted in Cal. Penal Code, §§ 837, 846 (West)).

But where the security guard has powers akin to that of a regular police officer and is appointed by a governmental official, even though employed by a private company, sufficient trappings of state authority have been found to trigger Fourth Amendment restrictions. Such is the case with a special police officer, commissioned in the District of Columbia under D.C.Code 1973, § 4–115.[3] *Lucas v. United States*, D.C.App., 411 A.2d 360 (1980); *accord, Pratt v. State*, 9 Md.App. 220, 263 A.2d 247 (Ct.Spec.App. 1970); *People v. Eastway*, 67 Mich.App. 464, 241 N.W.2d 249 (1976); *People v. Smith*, 82 Misc.2d 204, 368 N.Y.S.2d 954 (Crim.Ct. 1975); *People v. Diaz*, 85 Misc.2d 41, 376 N.Y.S.2d 849 (Crim.Ct. 1975); *see In re B.K.C.*, D.C.App., 413 A.2d 894 (1980); *cf. Griffin v. Maryland*, 378 U.S. 130, 135, 84 S.Ct. 1770, 1772, 12 L.Ed.2d 754 (1964) (deputized sheriff working as guard at amusement park possessed state authority and his action was subject to 42 U.S.C. § 1983 civil

---

**2.** Appellee argues that failure to apply the exclusionary rule in these circumstances would encourage merchants to use private citizens as security personnel to avoid Fourth Amendment constraints. The major purpose of the rule—to deter unreasonable police conduct—was never intended to, nor could it effectively, deter private conduct violative of that amendment if done by a police officer. *See United States v. Janis*, 428 U.S. 433, 446, 96 S.Ct. 3021, 3028, 49 L.Ed.2d 1046, *reh. denied*, 429 U.S. 874, 97 S.Ct. 196, 50 L.Ed.2d 158 (1976). There is no way to train citizens in general on the highly technical rules fashioned under the Fourth Amendment.

**3.** § 4–115. Special policemen—Appointment and compensation.

The Commissioner of the District of Columbia, on application of any corporation or individual, or in his own discretion, may appoint special policemen for duty in connection with the property of, or under the charge of, such corporation or individual; said special policemen to be paid wholly by the corporation or person on whose account their appointments are made, and to be subject to such general regulations as the District of Columbia Council may prescribe.

rights action); *Williams v. United States*, 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774 (1951) (private detective qualified as a special police officer acted under "color of law"); *National Labor Relations Board v. Jones & Laughlin Steel Corp.*, 331 U.S. 416, 429, 67 S.Ct. 1274, 1281, 91 L.Ed. 1575 (1947) (deputized guards subject to powers and liabilities of public officer when acting in that role). *But see State v. McDaniel, supra* (deputized security guards not subject to Fourth Amendment). However, the commissioning of special police officers by the District of Columbia does not make all their actions attributable to the government. A special police officer's communication of an employer's policy of requiring the attendance of the United States Attorney before store security guards will talk to the defense counsel in a shoplifting case was not an "official action" attributable to the District of Columbia. *United States v. McDougald*, D.C.App., 350 A.2d 375, 378 (1976).

The courts have distinguished actions of private security guards from those of commissioned or deputized special police officers for good reasons. Although both are privately employed with a duty to protect the property of their employer, the special police officer or deputized officer is commonly vested by the state with powers beyond that of an ordinary citizen; *cf. Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352, 95 S.Ct. 449, 454, 42 L.Ed. 477 (1974) (state delegated power traditionally associated with sovereignty can result in an implication of state action). The District of Columbia special police officer is commissioned by the Mayor, D.C.Code 1973, § 4–115, has the same power of arrest within his jurisdiction as a Metropolitan Police Officer, D.C.Code 1973, § 23–582(a), and may carry a pistol while on duty, D.C.Code 1973, § 22–3205. *See Lansburgh's Inc. v. Ruffin*, D.C.App., 372 A.2d 561, 565 n.10 (1977); *Singleton v. United States*, D.C.App., 225 A.2d 315 (1967). In contrast, a licensed security officer has only the power of arrest of an ordinary citizen. Regulation, § 4.1, 21 D.C.Reg. at 1209. They are not permitted to carry deadly weapons or handcuffs in the course of their employment, *id.* § 5.1(f) at 1212, nor may they wear uniforms resembling those of a police officer, *id.* §§ 4.2, 4.5 at 1210–11.

The District of Columbia licensing regulation was enacted in response to a "profound need to establish a regulation that would serve as a guideline to determine one's suitability for employment as a security officer and to establish certain requirements relative to identification." Memorandum from Marguerite C. Seldon, Chairman, Public Safety Committee, to D.C. City Council Members (Nov. 6, 1974). The legislative intent to regulate those persons who can qualify for security guard positions is not unlike the many other licensing statutes that exist in the District of Columbia: *e. g.* architects, D.C.Code 1973, §§ 2–1001 *et seq.*; attorneys, *id.* at §§ 11–2501 *et seq.*; money lenders, *id.* at § 26–601; professional engineers, *id.* at § 2–1808; physicians, *id.* at § 2–109, etc. The state's regulation of these businesses through licensing does not convert "their every action, absent more, into that of the State." *Jackson v. Metropolitan Edison Co., supra*, 419 U.S. at 354, 95 S.Ct. at 455; *cf. Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 176–77, 92 S.Ct. 1965, 1973, 32 L.Ed.2d 627 (1972) (licensing and regulation performed by the state was insufficient to implicate the Fourteenth Amendment). A security guard's actions under "license of state law" cannot be equated with "acting under authority of state law." *Weyandt v. Mason's Stores, Inc.*, 279 F.Supp. 283, 287 (W.D.Pa. 1968) (suspected shoplifter's 42 U.S.C. § 1983 action did not lie against licensed private detectives for deprivation of constitutional rights under "color of law"); *see Van Daele v. Vinci*, 294 F.Supp. 71, 74 (N.D.Ill. 1968). It is evident that the D.C. licensing statute in no way equated the powers of the security guard with the powers of police officers. In fact, there is a conscious effort to distinguish the security guard from special policemen or regular policemen by prohibiting the wearing of uniforms or badges resembling those officers. The state, by enacting this licensing statute, has vested no particu-

lar state authority in licensed security personnel.

▇▇▇ Neither can it be argued that Congress intended to make the citizen an agent of the state for the purposes of making arrests by enacting a statute codifying the citizen common law power of arrest. *See* D.C.Code 1973, § 23–582(b).[4] Congress' intent by enacting this statute was to define and restrict the private citizen's common law right to arrest. "[S]ection [23–582(b)] limits the scope of citizen arrest power to both felonies and specific misdemeanors, committed in the presence of the private person as distinguished from those not committed in his presence." *Anti-Crime Proposals: Hearings on H.R. 13689 and H.R. 12854 Before Subcomm. No. 1 of the District of Columbia Committee*, 91st Cong., 1st Sess. 95 (1969–1970) (statement of Donald Santarelli, Associate Deputy Attorney General). By so limiting the citizen's power of arrest, Congress recognized that "law enforcement should generally be carried out by professionals." H.R.Rep.No. 907, 91st Cong., 1st Sess. 118 (1969–1970); 1970 D.C. Legislative and Administrative Service 511. *See also United States v. Dorsey*, 146 U.S.App.D.C. 28, 30 n.4, 449 F.2d 1104, 1106 n.4 (1971). A citizen's arrest power presumes that a law-abiding citizen for his own personal purposes may desire to stop criminal activity just as a merchant has a personal interest in deterring theft of his goods. Consequently, Congress has recognized these legitimate private interests of apprehending persons committing certain crimes within their presence. The fact that a private person makes a citizen's arrest does not automatically transform that individual into an agent of the state. His conduct is not actionable for any deprivation under color of law of rights, privileges or immunities secured by the Constitution. *See Warner v. Cummings*, 303 F.Supp. 803 (D.Colo. 1969) (Colorado statute permitting merchant to question suspected shoplifter merely licensed the shopkeeper to take self-help and did not vest shopkeeper with authority of state permitting a 42 U.S.C. § 1983 action). Note, however, that in no case is the citizen, merchant, or his employee under a public duty to involve himself in this peace-keeping activity. "Self interest, not broad public interest, is their guide to action." *Smith v. Brookshire Brothers, Inc.*, 519 F.2d 93, 97 (5th Cir.), *cert. denied*, 424 U.S. 915, 96 S.Ct. 1115, 47 L.Ed.2d 320 (1975) (Gee, J., dissenting) (majority affirmed trial court finding that a prearranged plan between merchant and police for prosecution of shoplifters was sufficient to make the store an actor under "color of law" for a 42 U.S.C. § 1983 action). Solely permitting the act is insufficient "to support a finding of state action." *Warren v. Cummings, supra* at 806; *cf. Cantor v. Detroit Edison Co.*, 428 U.S. 579, 594–95, 96 S.Ct. 3110, 3119, 49 L.Ed.2d 1141 (1976) (even state encouragement of private action may be insufficient to implicate the state to confer anti-trust immunity where party was not compelled to act).

Indeed, the citizen's freedom from a duty to arrest must be distinguished from that of a police officer in the District of Columbia. Any member of the police force who neglects to make an arrest for offenses against the United States committed in his presence is guilty of a misdemeanor and punishable by imprisonment up to two years, or by a fine up to $500. D.C.Code 1973, § 4–143. Neither the licensing of security guards in the District of Columbia, nor the statutory citizen arrest power,

---

**4.** This section reads:

(b) A private person may *arrest* another—
(1) whom he has probable cause to believe is *committing in his presence*—
(A) a felony, or
(B) an offense enumerated in section 23–581(a)(2) [which includes petit larceny]; or
(2) in aid of a law enforcement officer or special policeman, or other person authorized by law to make an arrest.

(c) Any person making an arrest pursuant to this section *shall deliver the person arrested to a law enforcement officer without unreasonable delay.* [Emphasis added.]

As previously noted, the licensed or unlicensed security officer has only the arrest powers of an ordinary citizen.

serves to make these individuals officials or agents of the state.

The trial court reasoned in this case that since both licensed security guards and certified special police officers may perform the same functions in their security-related employment duties, they both should be subject to the Fourth Amendment. The appellee argues that security employees who go around "walking, talking, acting and getting paid like policemen" should in fact be treated as policemen for the purposes of the Fourth Amendment.

 We reject the contention that application of the Fourth Amendment can be resolved by looking at the nature of the activities performed by security employees. The mere fact that the "government engages in a particular activity doesn't automatically mean an individual entrepreneur ... [or employee] who undertakes the same activity suffers the same constitutional inhibitions." *Evans v. Newton*, 382 U.S. 296, 300, 86 S.Ct. 486, 489, 15 L.Ed.2d 373 (1966). The fact that the private sector may do for its own benefit what the state may also do for the public benefit does not implicate the state in private activity. A more significant relationship must be found between the state and private security employees to find state action; something whereby the state intrudes itself into private activities or maintains a symbiotic relationship with the private entity. *See Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

Private businesses have a right to protect their property from damage and loss. But they enjoy no special public trust, nor do they have any special powers in protecting their property. Application of the Fourth Amendment is not determined by the behavior of the security employee or the mistaken belief by others in his powers. *See People v. Santiago, supra,* 53 Misc.2d at 265, 278 N.Y.S.2d at 261–62. Instead, we conclude that there must be some *raison d'etat* or state agency before the Fourth Amendment is applicable.

Here the government had no part in the acquisition of the evidence. It was freely given to it by the employee. The evidence is no less competent because of its source, *Nueslein v. District of Columbia,* 73 App. D.C. 85, 87, 115 F.2d 690, 692 (1940), and its exclusion as evidence under the facts as found by the trial court was erroneous.

For reasons stated herein, the trial court order suppressing the evidence seized is

*Reversed.*

MACK, Associate Judge, with whom Associate Judge KELLY joins dissenting but concurring in the result:

I believe that my colleagues, having spoken of the need for "case by case determination," would concede that the question of "whether particular conduct is 'private,' on the one hand, or 'state action' on the other, frequently admits of no easy answer." *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 349–50, 95 S.Ct. 449, 452, 42 L.Ed.2d 477 (1974), *citing inter alia, Burton v. Wilmington Park Authority,* 365 U.S. 715, 723, 81· S.Ct. 856, 860, 6 L.Ed.2d 45 (1961). I am struck here, therefore, by the ease with which the majority opinion invokes constitutional principles to provide answers without regard to the facts. It fails to take into account that " '[d]ifferences in circumstances ... beget appropriate differences in law.' " *Burton, supra* at 726, 81 S.Ct. at 862, *citing Whitney v. Tax Commission,* 309 U.S. 530, 542, 60 S.Ct. 635, 640, 84 L.Ed. 909 (1940).

Obviously, I could not disagree with the general principle that the Fourth Amendment does not require suppression of evidence illegally seized by private citizens. *Burdeau v. McDowell,* 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921). My difficulty with the majority's approach stems from the strain of having to view a retail store security guard as a private citizen. Thus the government's witness testified that she was a "store detective" hired by the store "to apprehend and arrest shoplifters and dishonest employees"; that when she saw customers enter fitting rooms "our job was to go and peer in the fitting room by way of the louvered doors"; that

she peered at the appellee through the door, followed her from the store, apprehended her on the sidewalk, and told her she was under arrest. The witness further testified that she held appellee's arm, took her back inside to the security office, read the appellee her rights (that anything she said could be used against her and that she had a right to a lawyer), and began filling out the "required forms." The witness confirmed that she searched the person of appellee and her pocketbook (but denied that she asked the appellee to remove her clothes—a fact disputed by appellee who testified that she was ordered to strip and did so).

It was these facts, coupled with the government's argument that this was only a citizen's arrest based on probable cause (see D.C.Code 1973, § 23–582(b)) that prompted the trial judge to inquire "Whoever heard of a citizen making an arrest and conducting a search and reading *Miranda* rights and everything else?" It was also these facts on which appellee, suing the store in a civil action, was able to recover compensatory and punitive damages on counts charging not only conversion of the blouse she allegedly stole, but also assault, invasion of privacy, false imprisonment, defamation and intentional infliction of emotional distress.[1]

I would find less strain in embracing the majority's approach if it had based its conclusion simply on the concession of the government that its witness (who was not a special police officer) had not been certified as a security officer—as was mandatorily required by a 1974 District of Columbia regulation.[2] Under these circumstances, it might be difficult to find "state action" where the District of Columbia had not placed its "imprimatur" on a practice. *See Jackson, supra,* 419 U.S. at 356–57, 95 S.Ct.

at 456 distinguishing *Public Utilities Commission v. Pollak,* 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1951). It would thus not be difficult for me to agree (in isolation) with the majority when it states that here the witness "was acting as a private individual and not as an agent or instrumentality of the state" or that "*mere* employees performing security duties are neither officials nor agents of the government" (emphasis supplied). The point of my departure comes when the majority concludes that a retail security guard licensed by the District of Columbia, unlike a special police officer (*see Lucas v. United States,* D.C.App., 411 A.2d 360 (1980)), is not acting as an agent of the state when arresting citizens and referring them for prosecution.

It is somewhat incongruous for the majority to concede on one hand (as it must) that the Fourth Amendment is called into play when a private party "in light of all the circumstances" must be regarded as having acted as an instrument or agent of the state, and on the other hand to reject out of hand the consideration of *some* of the circumstances—that is, the nature of the activities performed by a security guard. For it is the nature of the activities performed by a security guard in acting as a substitute policeman which brings into play the state action. Thus a retail store security guard, who does more than protect his employer's property full-time, but who pursues, apprehends and detains criminals, who performs custodial searches (consensual or nonconsensual) or seizes and preserves evidence, and who interrogates and refers the criminal for prosecution is performing a police function exclusively reserved to the state.[3] *Cf. Evans v. Newton,* 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed.

---

1. While I do not take issue with the majority's analysis with respect to collateral estoppel, I am tempted to speculate as to what the government hopes to accomplish in its day in court.

2. *See Regulations Establishing Standards for Certification and Employment for Security Officers,* 21 D.C.Reg. 1203, as amended by the Security Officer Licensing Act of 1977, 24 D.C. Reg. 421.

3. At the time of the writing of this opinion, the court had at its disposal the benefit of comments as to prevailing practices in retail security management outlined (by Mr. Steven Euller) in a law review article not yet published (scheduled for publication in Vol. 15, # 3 of the Harvard Civil Rights—Civil Liberties Law Review) but lodged with the court.

1152 (1953); *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946). The function involves the exercise of power traditionally associated, not just with public interest, but sovereignty. *See Jackson, supra,* 419 U.S. at 352, 95 S.Ct. at 454. In such a case, there is mutual benefit and interdependence. *See Burton v. Wilmington Parking Authority, supra,* 365 U.S. at 724–25, 81 S.Ct. at 861. The strength of the "symbiotic relationship" (*see Jackson, supra,* 419 U.S. at 357, 95 S.Ct. at 456, distinguishing *Burton*), is emphasized by the suggestion that today shoplifting crime is handled almost exclusively by private security instead of public police. (*See* comments discussed note 3, *supra.*) "Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental charter as to become subject to the constitutional limitations placed upon state action." *Evans v. Newton, supra,* 382 U.S. at 299, 86 S.Ct. at 488. Thus a government, in encouraging, supporting, or even acquiescing in challenged conduct may be laying the groundwork sufficient for a finding of state action. *Reitman v. Mulkey,* 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); *Evans v. Newton, supra; Terry v. Adams, supra; Public Utilities Commission v. Pollak, supra.* Here, when the District of Columbia imposed the mandatory requirement of licensing for security guards, it placed its "imprimatur" upon the exercise of state power by a special group which should be subject to the same scrutiny for violations of constitutional rights as a special or public police officer. *See Jackson, supra,* 419 U.S. at 357, 95 S.Ct. at 456. If the license does not in effect accomplish this then there is no need for a license.

I would reverse, but solely on the ground that the store's employee, acting without a license and therefore as a private citizen, was not acting under color of law which would bring into play the operation of the exclusionary rule. I would leave it to the District of Columbia to enforce penalties for hiring private citizens to perform security duties in violation of licensing regulations. I would hold that licensed security guards are acting as an agency or instrumentality of the state when arresting and referring citizens for prosecution.