The STATE of Ohio, Appellee,

v.

COOK, Appellant.

[Cite as *State v. Cook,* 149 Ohio App.3d 422, 2002-Ohio-4812.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 19061.

Decided Sept. 13, 2002.

Mathias H. Heck Jr., Montgomery County Prosecuting Attorney, and Carley J. Ingram, Assistant Prosecuting Attorney, Appellate Division, for appellee.

Matthew Ryan Arntz and Michael L. Monta, for appellant.

BROGAN, Judge.

{¶ 1} The defendant in this case, Brian Cook, appeals from his conviction on 20 counts of possessing or viewing material showing a minor in a state of nudity. Cook was sentenced to an 11-month term of imprisonment on each count, to be served concurrently. He was also designated a sexual predator.

{¶ 2} On appeal, Cook raises three assignments of error, contesting (1) the search of his residence, (2) admission of materials generated from a "mirror image" made of the hard drive of his computer, and (3) his classification as a sexual predator. Upon consideration, we find that none of the assignments of error has merit. Accordingly, the trial court judgment will be affirmed. A brief discussion of our decision follows.

I

{¶ 3} As we said, the first assignment of error involves the issue of probable cause for a search of Cook's residence. In this regard, Cook contends that where probable cause for a search warrant is based in part on a prior warrantless search and seizure of personal property by a private citizen, at the instigation of the police, the evidence seized as a result of the search must be suppressed. Cook presented this issue at a suppression hearing as well as at trial. However, the trial court overruled the suppression motion and found that the search warrant was properly issued.

{¶ 4} The search warrant in this case was issued as the result of a tip to the police by Brian Brown, who was Cook's brother-in-law. The facts leading to the tip are as follows. On April 19, 1999, Brown, his wife, and son came to Cook's residence to stay for a few days. Brown and his family needed a temporary place to live, so Michelle Cook (Brown's sister and Brian Cook's wife) agreed to let the Browns come to her house. At the time, Brian Cook was out of state at a computer training seminar.

{¶ 5} On April 20, 1999, Brown was using the Cook's computer and happened upon a folder of pornographic pictures of children. There were about 4,000 pictures in the folder. Brown was very upset and called the Dayton Police Department to find out whether possession of such pictures was a crime. Because the Cook residence was in Kettering, Ohio, Brown was referred to the Kettering Police Department. Brown then copied pictures from the hard drive onto two diskettes, and took them to the Kettering Police.

{¶ 6} Officer Atkinson took a statement from Brown and placed the diskettes in a locker in the property room. The following day, Detective Green viewed the photos and contacted Brown. At that time, Brown told Green that he was staying at his brother-in-law's home at 2525 California Avenue in Kettering and that he had been using his brother-in-law's computer. Green then began to prepare a search warrant. Green drove by the California address to get a description of the house for the warrant. However, Green also felt he needed to confirm the fact that Brian Cook lived at the address. As a result, Green called Brown and asked him to bring in a piece of mail bearing Cook's name. After Brown did so, Green took the search warrant to a judge in Kettering Municipal Court.

{¶ 7} The warrant was served on April 22, 1999, when Brian Cook was still out of town. At that time, the police seized various items, including diskettes, several central processing units ("CPUs"), a keyboard, and a monitor. The hard drive of one CPU contained over 14,000 pornographic pictures. Consequently, Brian Cook was indicted for possession and reproduction of the pictures.

{¶ 8} Cook contends that the evidence should have been suppressed because Brown wrongfully conducted a search at the state's instigation to obtain probable cause for the search warrant. Cook further claims that the officers omitted pertinent facts from the affidavit for the search warrant, because they failed to tell the magistrate that a private citizen had performed a search and seizure in a private residence at their request. The trial court rejected this argument because the implication from Brown's testimony was that the mail in the residence was out in the open.

{¶ 9} "When we review suppression decisions, we do not evaluate credibility. Instead, we decide if the trial court properly applied the law. * * * Therefore, we 'accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard.'" *State v. Woods,* Montgomery App. No. 19005, 2002-Ohio-2355, 2002 WL 1000619, ¶ 14, quoting *State v. Retherford* (1994), 93 Ohio App.3d 586, 592, 639 N.E.2d 498.

{¶ 10} Ohio courts have held for many years that "[t]he constitutional right against unreasonable searches and seizures applies only to actions by the government and its officers and not to acts of private individuals." *State v. McDaniel* (1975), 44 Ohio App.2d 163, 73 O.O.2d 189, 337 N.E.2d 173. As a result, even if a private person conducts an illegal search, the evidence will not be barred by the exclusionary rule. Id. at 171–172, 73 O.O.2d 189, 337 N.E.2d 173.

{¶ 11} If a private party acts as a government agent, the protection against unlawful searches and seizures may apply. See, e.g., *State v. Morris* (1975), 42 Ohio St.2d 307, 316, 71 O.O.2d 294, 329 N.E.2d 85, citing *Burdeau v. McDowell* (1921), 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048. "The test of government participation is whether, in light of all the circumstances, the private person 'acted as an "instrument" or agent of the state.' *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 487, 91 S.Ct. 2022, 29 L.Ed.2d 564, overruled in part on other grounds by *Horton v. California* (1990), 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112. ' "The cases in this area require a great deal of entanglement between the police and the private searcher before agency can be found." ' *State v. Byerly* (Aug. 21, 1998), Portage App. No. 97–P–0034, unreported, 1998 WL 637689, quoting *State v. Glavic* (Mar. 27, 1998), Lake App. No. 96–L–135, unreported, 1998 WL 156860." *State v. Jedd* (2001), 146 Ohio App.3d 167, 172, 765 N.E.2d 880.

{¶ 12} In the present case, Brian Brown made two "searches and seizures." The first, which is not contested, consisted of copying or downloading photos onto two diskettes, which were then taken to the police department. Brown was clearly not acting as a state agent at the time, since the police were not even aware of any alleged crime. Compare *State v. Villagomez* (1974), 44 Ohio App.2d 209, 216, 73 O.O.2d 215, 337 N.E.2d 167 (state action is not involved where officers become involved after private citizen gains possession of evidence). We also note that Brown's search and seizure were not unlawful, i.e., there was no indication that Brown's use of the computer was unauthorized or that he was forbidden to copy pictures.

{¶ 13} The second search and seizure is of the envelope identifying Cook as a resident at the 2525 California Avenue address. As a preliminary point, we note that Detective Green was mistaken in believing that Cook's status as a resident had to be verified. As the state correctly observes, we have previously stressed that in evaluating probable cause, " '[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *State v. Stocks* (Apr. 13, 2001), Montgomery App. No. 18614, 2001 WL 369773, * 3, quoting *State v. George* (1989), 45 Ohio St.3d 325, 544 N.E.2d 640, paragraph one of the syllabus. In *Stocks*, the defendant challenged a search warrant that did not indicate she was involved in criminal activity. Nonetheless, the affidavit did allege that criminal activity was being conducted on the premises where the defendant lived. We held that the proper connection was with the premises and that the affidavit furnished probable cause to search the premises (but not the

person of the defendant). Id. at * 3. In this regard, we remarked that whether the state could sufficiently connect the defendant "to evidence of criminal activity for purposes of conviction is a matter the fact-finder should resolve at trial; it is not something to be settled in a suppression decision." Id.

{¶ 14} The same reasoning applies in the present case. Specifically, the officers did not need verification that Brian Cook lived at the residence in order to obtain a warrant to search the premises. Instead, they needed only sufficiently reliable information that criminal activity was being conducted on the premises. This they had, through the pictures that were brought to the police department and the statement made by Brian Brown. Therefore, even if Brown had acted as an agent of the state (a point we need not address), his actions were irrelevant to the issue of probable cause.

{¶ 15} Accordingly, since the officers had sufficient information justifying a search of the premises at 2525 California Avenue, the first assignment of error is without merit and is overruled.

## II

{¶ 16} In the second assignment of error, Cook contends that the trial court erred in overruling his objection to admission of exhibits concerning the computer hard drive as well as evidence generated by the hard drive. At trial, Cook objected to admission of any materials generated from the mirror image that was made of the hard drive. The basis for the objection was the lack of reliability of processes used to create two mirror images of the hard drive.

{¶ 17} According to the testimony, a mirror image was made of the hard drive shortly after Cook's computer was seized. Detectives McEwen and Driscoll removed the hard drive from the property room and took it to a company called I.S.I., which is a commercial establishment used by the police department. I.S.I. has a machine that will take the content of hard drive A, duplicate it, and make a mirror image on hard drive B. The process itself is not complicated and involves nothing more than connecting a cable from the original hard drive to a replica hard drive. The machine then actually takes the content from the original hard drive and copies it onto a replica hard drive. A replica or mirror image of the hard drive is made so that the original hard drive is not contaminated by police investigation.

{¶ 18} The computer in this case was seized in April 1999. After the mirror image was made, the computer was returned to the property room and was kept there until January 2001, when Detective Driscoll made another mirror image. Driscoll handled computer forensics for the Kettering Police Department and had

been trained in the use of EnCase software. EnCase is forensics software that is used to retrieve information from computers.

{¶ 19} Using EnCase with the mirror image hard drive, Driscoll generated a report hundreds of pages long, containing a complete history of everything on the computer's hard drive. Among the contents were over 14,000 pornographic pictures, covering a wide range of dates. These pictures were found on the D drive of the computer, which was named "Cook." In the D drive, under "pictures," was a folder or directory called "Pictures Two." Within this folder was a "Pre-teen" folder, which contained various pornographic pictures of children. The pictures had been downloaded from the Internet using a program called Pic-tureagent, which was registered to Brian Cook. Originally the pictures were downloaded (or copied) from the Internet to an "alt binaries" file, which is a temporary folder. The pictures were then deposited in the "Pictures Two" folder (probably automatically by Pictureagent) and were available on a permanent basis for viewing. The photos used for the indictment bore various dates, such as March 1, 8, 10, and 14, 1999, and April 12, 1999. These were all dates when Brown was not present in the residence, and Cook was present.

{¶ 20} When Detective Driscoll made the mirror image of the hard drive, he checked the date and time shown on the computer's internal clock with the "real world" time. The computer's clock was within five minutes of the actual date and time.

{¶ 21} At trial, Cook objected to admission of any materials connected with the mirror image on the basis that the state did not establish the reliability of the mirror image. In particular, Cook complained about the lack of testimony about I.S.I.'s qualifications, Detective McEwen's failure to check the time on the computer when the first mirror image was made, and the police department's failure to use proper protective measures like antistatic bags to prevent damage to the computer. Cook also presented testimony from an expert who expressed concern over the accuracy of dates on the computer files. However, the trial court admitted the evidence over Cook's objections.

{¶ 22} Trial courts normally have "broad discretion in determining the admis-sibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake Cty.* (1991), 58 Ohio St.3d 269, 271, 569 N.E.2d 1056. Our review of this point is confined to an analysis of whether the trial court abused its discretion, i.e., we decide whether the trial court acted "unreasonably, arbitrarily or unconscionably." Id.

{¶ 23} After reviewing the trial testimony, we cannot find that the trial court abused its discretion. Authentication is governed by Evid.R. 901(A), which provides that authentication "as a condition precedent to admissibility is satisfied

by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(B)(9) further states that "[e]vidence describing a process or system used to produce a result and showing that the process or system produces an accurate result" is one example of authentication conforming to the requirements of the rule.

{¶ 24} In the present case, there is no doubt that the mirror image was an authentic copy of what was present on the computer's hard drive. In fact, Cook's own expert, Brian Fite, testified that he was satisfied with the way the information was collected, meaning Detective Driscoll's downloading of information from the mirror image. What Fite was concerned about instead were events that may have happened before the mirror image was made. For example, Fite suggested that proper procedures may not have been followed with regard to (1) unplugging the computer before storing it, (2) wrapping the computer in antistatic material, and (3) maintaining energy to the internal battery. However, Fite also said that he did not know how the hard drive of the computer was removed and did not know whether improper removal had occurred.

{¶ 25} Fite's primary criticism was that he was not allowed to examine the C–MOS chip, which was located on the motherboard of the computer. According to Fite, this chip is not part of the hard drive. The chip is fed from a battery on the motherboard and sets the reference time for the operating system of the computer. Fite compared the C–MOS clock to a watch battery, which can be drained of voltage if the computer is unplugged. Again, Fite did not say that damage had occurred or that the time-date references were incorrect; he said only that inaccurate readings can occur if, for example, the internal battery for the motherboard loses voltage. He also felt that something may have been occurring with the computer's clock because he found some Internet entries dated in 1994 and 1997, even though the manufacture date of the hard drive appeared to be 1998.

{¶ 26} In contrast, Detective Driscoll indicated, as we said, that the computer clock was within five minutes of real time when he made the mirror image. In view of the testimony, the issue is not really one of authentication; instead, it is what weight should be given to the evidence.

{¶ 27} Once evidence is properly admitted, the trier of fact decides the proper weight. See, e.g., *State v. Woods* (Feb. 9, 1994), Montgomery App. No. 13734, 1994 WL 37313, * 4, and *State v. D'Ambrosio* (1995), 73 Ohio St.3d 141, 147, 652 N.E.2d 710. In the present case, the defense theory was that the pornographic pictures were placed on the Cook computer by Brian Brown, due to Brown's dislike of his sister's husband. To prove that theory, the defense attempted to discredit the date and time of creation of the picture folders and files. The defense also introduced testimony about ill will between the two men and the fact

that some pornographic files were created on April 20, 1999, when Cook was admittedly out of town. Brown and Cook also appeared to share an interest in adult pornography, as Brown's own statement to the police indicated that he discovered the pictures of children while looking through some of the adult pornographic pictures on Cook's computer.

{¶ 28} On the other hand, the state presented evidence that Cook could have accessed his home computer from a remote location and that the computer's clock was correct. Moreover, Detective Driscoll testified that over 14,000 child pornography pictures with many varied dates were on the computer. To change the dates of these files, Brown would have had to access and change the date on each individual file. Given the brief time that Brown had access to the Cook computer, such a scenario appears unlikely. We do note that Fite suggested that programs could be written to change dates, but no evidence was presented to indicate that Brown had the expertise to write such a program or that such a program was used.

{¶ 29} Thus, while some conflicts existed in the testimony, they relate to the weight of the evidence, not its admissibility. Since the evidence was properly authenticated, the trial court acted correctly in admitting materials derived from the mirror image made of the Cook hard drive. The weight the court gave to the evidence thereafter was within its discretion. Consequently, the second assignment of error is without merit and is overruled.

### III

{¶ 30} The third assignment of error contests the trial court's designation of Brian Cook as a sexual predator. In this regard, Cook contends that the trial court erred in not properly considering the statutory factors and setting forth reasoning sufficient for a sexual-predator finding.

{¶ 31} R.C. 2950.09(B)(3) provides that when deciding whether an offender is a sexual predator, the judge "shall consider all relevant factors, including, but not limited to all of the following: (a) [t]he offender's or delinquent child's age; (b) [t]he offender's or delinquent child's prior criminal or delinquency record regarding all offenses, including, but not limited to, all sexual offenses; (c) [t]he age of the victim of the sexually oriented offense for which sentence is to be imposed or the order of disposition is to be made; (d) [w]hether the sexually oriented offense for which sentence is to be imposed or the order of disposition is to be made involved multiple victims; (e) [w]hether the offender or delinquent child used drugs or alcohol to impair the victim of the sexually oriented offense or to prevent the victim from resisting; (f) [i]f the offender or delinquent child previously has been convicted of or pleaded guilty to, or been adjudicated a delinquent child for committing an act that if committed by an adult would be, a

criminal offense, whether the offender or delinquent child completed any sentence or dispositional order imposed for the prior offense or act and, if the prior offense or act was a sex offense or a sexually oriented offense, whether the offender or delinquent child participated in available programs for sexual offenders; (g) [a]ny mental illness or mental disability of the offender or delinquent child; (h) [t]he nature of the offender's or delinquent child's sexual conduct, sexual contact, or interaction in a sexual context with the victim of the sexually oriented offense and whether the sexual conduct, sexual contact, or interaction in a sexual context was part of a demonstrated pattern of abuse; (i) [w]hether the offender or delinquent child, during the commission of the sexually oriented offense for which sentence is to be imposed or the order of disposition is to be made, displayed cruelty or made one or more threats of cruelty; (j) [a]ny additional behavioral characteristics that contribute to the offender's or delinquent child's conduct."

{¶ 32} Additionally, under R.C. 2950.09(B)(4), the sexual predator determination must be by "clear and convincing evidence," which has been defined as " 'that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.' " *State v. Eppinger* (2001), 91 Ohio St.3d 158, 164, 743 N.E.2d 881, quoting *Cross v. Ledford* (1954), 161 Ohio St. 469, 477, 53 O.O. 361, 120 N.E.2d 118. "In reviewing a trial court's decision based upon clear and convincing evidence, an appellate court must examine the record to determine whether sufficient evidence exists to satisfy the requisite degree of proof." *State v. Winchester* (2001), 145 Ohio App.3d 92, 95, 761 N.E.2d 1125.

{¶ 33} In *Eppinger,* the Ohio Supreme Court commented that while "certainly even one sexually oriented offense is reprehensible and does great damage to the life of the victim, R.C. Chapter 2950 is not meant to punish a defendant, but instead, 'to protect the safety and general welfare of the people of this state.' R.C. 2950.02(B). Thus, if we were to adjudicate all sexual offenders as sexual predators, we run the risk of 'being flooded with a number of persons who may or may not deserve to be classified as high-risk individuals, with the consequence of diluting both the purpose behind and the credibility of the law. This result could be tragic for many.' " 91 Ohio St.3d at 165, 743 N.E.2d 881, quoting *State v. Thompson* (1999), 140 Ohio App.3d 638, 748 N.E.2d 1144. Other courts have made similar observations. See *State v. Arthur* (Aug. 16, 2001), Cuyahoga App. No. 77770, 2001 WL 931631, * 8 (indicating that "indiscriminately classifying every offender as a sexual predator without regard to the likelihood of recurrence dilutes the meaning of the label and undermines the purpose of the statute").

{¶ 34}  In the present case, the trial court received information from a presentence investigation report and a forensic psychologist.  A 1996 House Bill 180 screening instrument completed by the adult probation department indicated no "yes" responses for the nine areas scored.  Accordingly, the probation department recommended that Cook be designated a "sexually oriented offender" (the lowest of the three categories of sexually oriented offender, habitual sex offender, and sexual predator).  The probation department also recommended that Cook be given community control.

{¶ 35}  The forensic psychologist (Dr. Dyer) refused to say whether Cook fit the term "sexual offender" or "sexual predator" because these were legal rather than psychological terms.  However, Dr. Dyer did address the factors outlined in R.C. 2950.09(B)(3)(a) through (j).  She also administered the Personality Assessment Inventory.  According to Dr. Dyer, Cook's validity scales indicated that he produced a valid profile.  Dr. Dyer further stated that Cook "shows no significant psychotherapy, but does reveal himself to be unmotivated for treatment at the present time.  It may be that he is behaving in a consistent manner with his allegations of innocence in the instant offense."

{¶ 36}  Concerning the offense itself, Dr. Dyer indicated that it was a noncontact offense for which no clear base-rate of recidivism was available.  Dr. Dyer also did not appear to find great significance in most of the statutory factors.  For example, factor (d) is "[w]hether the sexually oriented offense for which sentence is imposed involved multiple victims."  In this regard, Dr. Dyer commented that "[t]here were multiple victims in the instant offense, but I am unaware of any research which indicates that number of victims *within* an offense affects the risk for recidivism, especially given a noncontact offense."  (Emphasis sic.)

{¶ 37}  Dr. Dyer did find the risk increased somewhat by past criminal record, as Cook had been convicted previously of a misdemeanor.  According to the history Cook related, he had recently been charged with corruption of a minor in connection with a 15–year–old girl he met on the Internet and corresponded with for some time.  Cook indicated that they did not have sex, but did "fool around."  This charge was reduced to a misdemeanor, i.e., attempted corruption of a minor.  Cook pleaded guilty to the misdemeanor and received a fine, but no jail time.

{¶ 38}  Regarding factor (j) (any other behavioral characteristics), Dr. Dyer noted: "Mr. Cook is staunch in his denial of guilt and his intent to appeal his conviction."  Although he "admits he will have to 'do what they tell me to do,' his position does not bode well for successful treatment.  While I believe he would be compliant with treatment mandates, his commitment to dealing with issues of sexual deviance may be less than optimal."

{¶ 39}  Based on the history and psychological tests, Dyer recommended Cook for community-based control and referral to a sex-offender-specific treatment

program. The probation department also recommended community control. Subsequently, at the sexual-predator hearing, the prosecutor said he would stand mute. The prosecutor then commented:

{¶ 40} "The court has heard all the testimony and has the benefit of a psychological report. And * * * [a]lthough the state would not indicate that it recommends that the Defendant be considered a—a—sexual predator, certainly * * * I think the matter lies between * * * whether or not the Court believes this man is either a * * * habitual sexual offender or a sexually oriented offender. And I submit that * * * those are the two * * * designations that * * * are appropriate under the law. And I would—I would submit that it be up to the Court's sound discretion in either case."

{¶ 41} After the prosecutor made these remarks, the judge asked whether the prosecutor knew about Cook's criminal record. The prosecutor responded that he was aware of a prior sexual offense, but was not certain whether there was a conviction. At this point, the judge stated that the prior charge was a felony charge and that he understood that Cook had met a 15–year–old girl over the Internet, had taken her to his home, and had sex with her. Although the girl alleged that the encounter was videotaped, Cook denied any videotaping. Cook then pleaded guilty to a misdemeanor. After making these remarks, the judge said, "And you still don't think he's a sexual predator?" The prosecutor then commented that he would leave the matter to the court's discretion. Following this discussion, the judge found Cook to be a sexual predator. The judge also disregarded the recommendation of both the probation department and Dr. Dyer, and sentenced Cook to 11 months in prison on each count, to be served concurrently.

{¶ 42} The record submitted to us does not contain some of the information discussed by the judge. Specifically, the only reference to the misdemeanor conviction is contained in Dr. Dyer's report, where Cook discloses the conviction, but denies having had sex with his victim. In contrast, the presentence investigation report does not even mention a prior conviction, nor does it offer any of the details mentioned by the court. Cook's background and family circumstances were devoid of any apparent problems, sexual abuse, or criminal involvement of any kind, other than the misdemeanor conviction.

{¶ 43} In a sexual-predator determination, the trial judge "must consider the guidelines set out in R.C. 2950.09(B)(2), but the judge has discretion to determine what weight, if any, he or she will assign to each guideline." *State v. Thompson* (2001), 92 Ohio St.3d 584, 752 N.E.2d 276, paragraph one of the syllabus.

{¶ 44} In *State v. Maynard* (1999), 132 Ohio App.3d 820, 726 N.E.2d 574, the Ninth District Court of Appeals affirmed a trial court determination that the

defendant was a sexual predator when the defendant was convicted of possessing child pornography that he had downloaded and stored on his computer. The Ninth District cited with approval *State v. Daniels* (Feb. 24, 1998), Franklin App. No. 97APA06–830, 1998 WL 85882, wherein the defendant's conviction of gross sexual imposition with a four year old, coupled with a failure to complete sexual counseling, was found to support the trial court's determination that the defendant was a sexual predator. In this regard, the Ninth District quoted language from *Daniels* to the effect that " 'the overwhelming statistical evidence support[s] the high potential of recidivism among sex offenders whose crimes involve the exploitation of young children.' " 132 Ohio App.3d at 827, 726 N.E.2d 574.

{¶ 45} In the present case, the trial court was particularly concerned about Cook's conduct of engaging in sexual activity with a 15–year–old child in light of Cook's obvious interest in child pornography. A relevant factor in making the predator determination is the age of the victim of the sexually oriented offenses. R.C. 2950.09(B)(3)(c). There was also evidence that Cook was in denial in the face of strong evidence of his guilt of both offenses. Consequently, we cannot say that the trial court acted unreasonably in reaching the conclusion that Cook was likely to engage in sexually oriented offenses in the future. As a result, the third assignment of error is overruled.

{¶ 46} Based on the above discussion, all three assignments of error are overruled, and the judgment of the trial court is affirmed.

Judgment affirmed.

WOLFF, P.J., and GRADY, J., concur.