OPINION
{¶ 1} Defendant-appellant Gary Ladigo appeals from his conviction entered in Mahoning County Court No. 4. Ladigo was convicted of driving while under the influence of alcohol, violations of R.C. 4511.19(A)(1)(a) and R.C. 4511.19(A)(1)(d), and driving left of center, a violation of R.C. 4511.25. The assignment of error that is raised in this appeal claims that the trial court erred when it denied Ladigo's suppression motion. This assignment contains two issues. The first issue questions the constitutionality of R.C. 4511.19(D)(4)(b), which requires field sobriety tests to be administered in substantial compliance with testing standards set forth by the National Highway Traffic Safety Administration. The second issue is if R.C.4511.19(D)(4)(b) is constitutional, did the trooper administer the field sobriety tests in substantial conformity with the testing standards set forth by the National Highway Traffic Safety Administration. For the following reasons, the judgment of the trial court is hereby affirmed.
 STATEMENT OF FACTS {¶ 2} On April 8, 2005, Trooper Michael Helmick, of the State Highway Patrol, stopped a silver Pontiac driven by Ladigo. (Tr. 3). Ladigo was driving westbound on Mahoning Avenue, in Mahoning County, approaching Turner Road. (Tr. 4). According to the trooper, prior to approaching Turner Road, Ladigo merged into the left turning lane "way too soon." (Tr. 4, 17). By entering the turning lane "too soon," Ladigo drove through the bike path crossing that runs across Mahoning Avenue. (Tr. 4, 17). On Turner Road, the trooper observed Ladigo go left of center three times within a distance of approximately 1,000 feet. (Tr. 4-6). Thus, Trooper Helmick initiated a stop.
 {¶ 3} While speaking with Ladigo, Trooper Helmick detected a strong odor of alcohol emanating from Ladigo's breath, and additionally noticed that his speech was slurred and his eyes were glassy and bloodshot. (Tr. 8). At that point, Trooper Helmick administered the standardized field sobriety tests: the Horizontal Gaze Nystagmus (HGN), the one-leg stand, and the walk and turn. (Tr. 9). Ladigo exhibited multiple clues in each of the tests, thereby indicating that he was intoxicated. (Tr. 91-1).
 {¶ 4} Trooper Helmick then arrested Ladigo and transported him to the Austintown Police Department where a BAC DataMaster test was given. (Tr. 14). Ladigo blew a .121. (Tr. 16).
 {¶ 5} Given those results and Trooper Helmick's observations, Ladigo was charged with R.C. 4511.19(A)(1)(a) (operating a vehicle while under the influence of alcohol), R.C.4511.19(A)(1)(d) (operating a vehicle with a prohibited concentration of alcohol), and R.C. 4511.25 (left of center). Ladigo entered a not guilty plea.
 {¶ 6} On June 9, 2005, Ladigo filed a motion to suppress. The motion was based upon the unconstitutionality of R.C.4511.19(D)(4)(b) and also based upon the belief that the field sobriety tests were not performed in substantial compliance with the standards set forth by the National Highway Traffic Safety Administration. A suppression hearing occurred on September 22, 2005. Ladigo once again argued the constitutionality of R.C.4511.19(D)(4)(b) and the failure to substantially comply with the standards for administering field sobriety tests. (Tr. 24-25). The trial court denied the motion on September 26, 2005.
 {¶ 7} On October 3, 2005, Ladigo entered a no contest plea. The trial court found him guilty. It sentenced him to 30 days in jail with 27 days suspended. Ladigo was given the option to serve the remaining three days in DIP (Driver Intervention Program) in lieu of jail. Ladigo was also placed on probation for 12 months. The court fined him $350, plus court costs.
 {¶ 8} Ladigo timely appeals from the conviction. The sentence has been stayed pending appeal. 11/03/05 J.E.
 ASSIGNMENT OF ERROR {¶ 9} "THE TRIAL COURT ERRED IN DENYING MR. LADIGO'S MOTION TO SUPPRESS.'
 {¶ 10} Ladigo divides this assignment of error into two parts. The first part deals with the constitutionality of R.C.4511.19(D)(4)(b). The second part addresses whether there was compliance with the standards.
 Constitutionality of R.C. 4511.19(D)(4)(b) {¶ 11} In 2000, the Ohio Supreme Court issued its State v.Homan, 89 Ohio St.3d 421, 2000-Ohio-212, opinion. In this opinion, the Court concluded that "in order for the results of a field sobriety test to serve as evidence of probable cause to arrest, the police must have administered the test in strictcompliance with standardized testing procedures." Id. at 424 (emphasis added).
 {¶ 12} In response to Homan's strict compliance mandate, the legislature passed S.B. 163. S.B. 163 amended R.C.4511.19(D)(4)(b) to read as follows:
 {¶ 13} "(b) In any criminal prosecution or juvenile court proceeding for a violation of division (A) or (B) of this section, of a municipal ordinance relating to operating a vehicle while under the influence of alcohol, a drug of abuse, or alcohol and a drug of abuse, or of a municipal ordinance relating to operating a vehicle with a prohibited concentration of alcohol in the blood, breath, or urine, if a law enforcement officer has administered a field sobriety test to the operator of the vehicle involved in the violation and if it is shown by clear and convincing evidence that the officer administered the test insubstantial compliance with the testing standards for any reliable, credible, and generally accepted field sobriety tests that were in effect at the time the tests were administered, including, but not limited to, any testing standards then in effect that were set by the national highway traffic safety administration, all of the following apply:
 {¶ 14} "(i) The officer may testify concerning the results of the field sobriety test so administered.
 {¶ 15} "(ii) The prosecution may introduce the results of the field sobriety test so administered as evidence in any proceedings in the criminal prosecution or juvenile court proceeding.
 {¶ 16} "(iii) If testimony is presented or evidence is introduced under division (D)(4)(b)(i) or (ii) of this section and if the testimony or evidence is admissible under the Rules of Evidence, the court shall admit the testimony or evidence and the trier of fact shall give it whatever weight the trier of fact considers to be appropriate."
 {¶ 17} Ladigo essentially argues that R.C. 4511.19(D)(4)(b) is unconstitutional because it violates the separation of powers. Under Article IV, section 5(B) of the Ohio State Constitution, it states:
 {¶ 18} "The supreme court shall prescribe rules governing practice and procedure in all courts of the state, which rules shall not abridge, enlarge, or modify any substantive right. * * * All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect."
 {¶ 19} Ladigo claims that under this rule, the Ohio Supreme Court has established the Ohio Rules of Evidence. And that "[l]ike the Ohio Rules of Civil Procedure, the Ohio Rules of Evidence, which were promulgated by the Supreme Court pursuant to section 5(B), Article IV of the Ohio Constitution, must control over subsequently enacted inconsistent statutes purporting to govern evidentiary matters." State ex rel. Ohio Academy of TrialLawyers v. Sheward, 86 Ohio St.3d 451, 491, 1999-Ohio-123.
 {¶ 20} Ladigo's proposition is that R.C. 4511.19(D)(4)(b) is inconsistent with Evid.R. 702 and, as such, that inconsistency renders the statute unconstitutional. Under Evid.R. 702 scientific evidence is not admissible unless the proponent of the evidence lays a proper foundation by presenting adequate expert testimony concerning the reliability of the specific procedures used and the underlying scientific principles or theories. Ladigo maintains that although Homan did not cite to Evid.R. 702, its requirement of strict compliance was based upon an implicit interpretation of the rule. Accordingly, Ladigo contends that when the General Assembly enacted R.C. 4511.19(D)(4)(b) it was establishing a new rule of evidence. Since the General Assembly has no authority to do so, Ladigo claims R.C. 4511.19(D)(4)(b) is unconstitutional.
 {¶ 21} We disagree. Evid.R. 101(C)(1) specifically states that the Rules of Evidence do not apply to admissibility determinations. Or, in other words, the Rules of Evidence do not apply at suppression hearings. Maummee v. Wiesner,87 Ohio St.3d 295, 298, 1999-Ohio-68 (stating the court may rely on hearsay during suppression hearing regardless of whether hearsay would be admissible at trial); State v. Woodring (1989),63 Ohio App.3d 79 (stating the suppression ruling is preliminary as to admissibility); State v. Koueviakoe, 4th Dist. No. 04CA11,2005-Ohio-852; State v. Bishop, 2d Dist. No. 2003-CA-37,2004-Ohio-6221 (stating the Rules of Evidence and exclusionary rules do not apply in a suppression hearing); State v. Edwards,
5th Dist. No. 2003 AP 09 0077, 2004-Ohio-870.
 {¶ 22} Furthermore, in addressing R.C. 4519.11(D)(4)(b) and its constitutionality, the Fifth Appellate District explained:
 {¶ 23} "`[T]he express terms of Evid.R. 101(C)(1) specifically provide that the Rules of Evidence do not apply to determinations prerequisite to rulings on the admissibility of evidence when the issue is to be determined by the court under Evid.R. 104. Evid.R. 104(A) provides that preliminary questions concerning the admissibility of evidence shall be determined by the court, and in making its determination, it is not bound by the Rules of Evidence except those with respect to privileges. Thus, by its own terms, the Ohio Rules of Evidence are not applicable in suppression hearings. State v. Woodring (1989),63 Ohio App.3d 79. Since the Rules of Evidence do not apply in suppression hearings in the first place, R.C. 4511.19(D)(4)(b) cannot be in conflict with any Evidence Rule in a motion to suppress context." Mount Vernon v. Seng, 5th Dist. No. 04CA000012, 2005-Ohio-2915, ¶ 69 (Judge Boggins writing, Judge Edwards concurring in judgment but expressing other reasons for the judgment, and Judge Gwin dissenting based upon reasoning inState v. Robinson, 160 Ohio App.3d 802, 2005-Ohio-2280, appeal not allowed by 106 Ohio St.3d 1544), quoting State v. Nutter,128 Ohio Misc.2d 24, ¶ 6. But see State v. Hall,163 Ohio App.3d 90, 2005-Ohio-4271, ¶ 16 (explaining that arguing that the Rules of Evidence do not apply to a suppression hearing misses the point (Fifth District written by Judge Gwin)).
 {¶ 24} We find the above reasoning logical. As the Rules of Evidence do not apply to suppression hearings, there is no conflict between R.C. 4511.19(D)(4)(b) and Evid.R. 702. Thus, as to suppression issues, R.C. 4511.19(D)(4)(b) is not unconstitutional. Consequently, the substantial compliance standard in R.C. 4511.19(D)(4)(b) is applicable.
 Substantial Compliance {¶ 25} Next, Ladigo argues that the field sobriety tests should have been suppressed because the tests were not administered in substantial compliance with the standards. His argument is based upon the trooper's use of the word "believe" when answering questions concerning whether the trooper complied with the standards.
 {¶ 26} In discussing the application of the tests, the trooper stated the following: {¶ 27} "Q. Are there three certain standardized field sobriety tests that you're required to administer?
 {¶ 28} "A. Yes.
 {¶ 29} "Q. Did you ask him to perform them?
 {¶ 30} "A. Yes, I did.
 {¶ 31} "Q. What were the three field sobriety tests?
 {¶ 32} "A. The horizontal gaze nystagmus, the one-leg stand, and a walk and turn test.
 {¶ 33} "Q. In regards to the horizontal gaze nystagmus test, are you looking for clues in the left eye and the right eye?
 {¶ 34} "A. Yes.
 {¶ 35} "Q. Each of those clues indicate alcohol ingestion?
 {¶ 36} "A. Right.
 {¶ 37} "Q. In the left eye, how many clues did you find?
 {¶ 38} "A. Three.
 {¶ 39} "Q. Is that the maximum you could find?
 {¶ 40} "A. For the left eye, yes.
 {¶ 41} "Q. In the right eye, how many clues did you find?
 {¶ 42} "A. Three.
 {¶ 43} "Q. Is that the maximum?
 {¶ 44} "A. Yes.
 {¶ 45} "Q. Does that indicate, based upon your training, that each of those clues indicate a sufficient quantity of alcohol —
 {¶ 46} "A. Yes.
 {¶ 47} "Q. — is in the defendant's system? All right. Now, you asked him to perform two additional sobriety tests?
 {¶ 48} "A. Yes, I did.
 {¶ 49} "Q. What are they?
 {¶ 50} "A. A one-leg stand and a walk and turn test.
 {¶ 51} "Q. Did you administer them in that order?
 {¶ 52} "A. Yes.
 {¶ 53} "Q. The one-leg stand test, tell us what clues you were looking for during the test.
 {¶ 54} "A. During the test the defendant was swaying, which was one clue. The defendant dropped his foot. I believe he dropped it six times. That's another clue, that he dropped his foot in general. He had to raise his arms over six inches to help assist with his balance. During the test he hopped, and he was — the other clue is he was unable to perform the test due to dropping his foot numerous times.
 {¶ 55} "Q. Now, in reference to the heel to toe test, what were the clues that you were looking for in that?
 {¶ 56} "A. During — while I was giving the instructions he was required to stand heel to toe with his hands down to his side. That was one clue that he was unable to perform. He was unable to walk on the line. He stepped off the line. He didn't walk heel to toe. I believed he raised his arms to help with balance there, and he also turned incorrectly.
 {¶ 57} "* * *
 {¶ 58} "Q. Now did you perform these tests in compliance with the standards that have been imposed under the (inaudible) court rule?
 {¶ 59} "A. Yes, I did.
 {¶ 60} "* * *
 {¶ 61} "Q. What was the manual?
 {¶ 62} "A. It's the National Highway Traffic Safety.
 {¶ 63} "Q. Did you perform these tests in strict compliance therewith?
 {¶ 64} "A. I believe I did.
 {¶ 65} "* * *
 {¶ 66} "[Cross examination by Mr. Zomoida — Ladigo's attorney] Q. Where did you administer the field sobriety test? Explain to the court what the elevation of the roadway was.
 {¶ 67} "A. I don't know what the elevation of the roadway is.
 {¶ 68} "Q. Was it as — did you stop him on a slope?
 {¶ 69} "A. I don't think we were on a slope, no. We drove through all the slopes.
 {¶ 70} "Q. What about the condition of Turner Road when you were giving him the test; what was the — what was the condition of the pavement? Was it —
 {¶ 71} "A. It appeared to be normal pavement.
 {¶ 72} "Q. Were there any stones, any loose gravel?
 {¶ 73} "A. I don't believe so.
 {¶ 74} "Q. You don't believe so?
 {¶ 75} "A. No.
 {¶ 76} "Q. Can you testify with certainty that there were not any loose stones; there wasn't any gravel?
 {¶ 77} "A. If there was anything that would have hindered his test, we wouldn't have done the test there.
 {¶ 78} "Q. So when he did the walk and turn and the one-leg stand, he wasn't performing that test going up or down a slope on Turner Road?
 {¶ 79} "A. I don't believe so, no.
 {¶ 80} "Q. You don't believe so?
 {¶ 81} "A. No." (Tr. 9-19).
 {¶ 82} This court's standard of review with respect to a motion to suppress is limited to determining whether the trial court's findings are supported by competent, credible evidence.State v. Winand (1996), 116 Ohio App.3d 286, 288, citingTallmadge v. McCoy (1994), 96 Ohio App.3d 604, 608. Such a standard of review is appropriate as "[i]n a hearing on a motion to suppress evidence, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate the credibility of witnesses." State v. Hopfer
(1996), 112 Ohio App.3d 521, 548, quoting State v. Venham
(1994), 96 Ohio App.3d 649, 653.
 {¶ 83} As a reviewing court, this court must accept the trial court's factual findings and the trial court's assessment of witness credibility. State v. Brown (Sept. 7, 1999), 7th Dist. No. 96BA22, citing State v. Anderson (1995),100 Ohio App.3d 688, 691. However, once this court has accepted those facts as true, it must independently determine as a matter of law whether the trial court met the applicable legal standard. State v.Cook, 149 Ohio App.3d 422, 2002-Ohio-4812, ¶ 9.
 {¶ 84} As aforementioned and established above, at the suppression hearing, the standard utilized for the walk and turn, the one-leg stand and the HGN tests is substantial compliance. See R.C. 4511.19(D)(4)(b). The above testimony shows that there was substantial compliance.
 {¶ 85} The fact that the trooper used the word believe multiple times throughout the testimony is not an absolute indication of uncertainty, as Ladigo would suggest. The word "believe," as defined by Webster's, means "to accept as true" or "to hold as an opinion." Webster's Tenth Collegiate Dictionary (1998) 104. In everyday usage, the word "believe" could be used to indicate a firm conviction or it could be used to show uncertainty. It depends on the context.
 {¶ 86} When the entire testimony is taken within its context, it can be seen that the trooper's use of the word believe for these two tests does not absolutely show uncertainty as to whether the tests were performed in substantial compliance with the standards. For instance, when the trooper is discussing the one-leg stand test, he used the word believe to indicate the number of times Ladigo dropped his foot. (Tr. 10). In the previous sentence, the trooper indicated, without using the word believe, that Ladigo dropped his foot. In the sentence following the use of the word believe, the trooper explained that dropping your foot, in general, is a clue the administrator is looking for to indicate intoxication. (Tr. 10). Thus, the use of the word "believe" in this situation does not change the fact that everything else the trooper had discussed shows substantial compliance with the testing standards.
 {¶ 87} Another example is in the situation where Ladigo's attorney is discussing the conditions of the road with Trooper Helmick, the trooper was asked if there was any stones or loose gravel on the road where the tests were performed. He responded, "I don't believe so." (Tr. 19). As questioning went on, the trooper was asked if he could testify with certainty that there were no loose stones. (Tr. 19). The trooper answered, "If there was anything that would have hindered his test, we wouldn't have done the test there." (Tr. 19). This context shows that the use of the word believe, in this situation, is not showing uncertainty.
 {¶ 88} Admittedly, there are some instances where the word believe could have been used to show uncertainty. For example, when asked whether he performed the tests in strict compliance with the standards set forth by the National Highway Traffic Safety manual, the trooper responded, "I believe I did." (Tr. 12).
 {¶ 89} That response could indicate uncertainty, but it could also indicate an absolute affirmation. For instance, if someone said "I believe so!" this would be an absolute affirmation. However, if the statement was "I believe so?" this would show uncertainty. This example illustrates that the way the word is said indicates whether uncertainty is present or whether it is an absolute affirmation. As an appellate court, we only review a cold record. From the transcript, there is no indication as to what the response "I believe I did," shows. We must trust the trial court. They are in the best position to view voice inflections and body language. Seasons Coal Co., Inc. v. City ofCleveland (1984), 10 Ohio St.3d 77. Obviously, from the trial court's ruling, it did not view any uncertainty in the trooper's responses.
 {¶ 90} Accordingly, from the testimony we can gather that the walk and turn and one-leg stand tests were performed in the appropriate conditions, that the trooper was adequately aware of the clues he was looking for and that the trooper stated that he strictly complied with the standards. This is sufficient to show substantial compliance for the walk and turn test and the one-leg stand test. As to the HGN test, the testimony divulges the clues the trooper was looking for and the trooper stated that he strictly complied with the standards. This is sufficient for substantial compliance. Thus, the trial court properly concluded that there was substantial compliance with the standards.
 {¶ 91} For the foregoing reasons, the judgment of the trial court is hereby affirmed.
Donofrio, P.J., concurs.
Waite, J., concurs.