{¶ 1} Defendant-appellant, Paul Zacharias, Jr. ("Zacharias"), appeals his conviction of public indecency. Finding no merit to the appeal, we affirm.
 {¶ 2} Zacharias was indicted on three counts: count one, gross sexual imposition, in violation of R.C. 2907.05(A)(1); count two, public indecency, in violation of R.C. 2907.09; and unlawful restraint, in violation of R.C. 2907.03. *Page 3 
He pled not guilty to the charges and the case proceeded to a jury trial. The following facts were presented at trial.
 {¶ 3} Susan Scardino-Resnick ("Scardino") testified that on Sunday, September 10, 2006, she was working as bartender/bar manager at Zach's Steakhouse. She worked the 10:30 a.m. to 6:00 p.m. shift that day, which was her normal shift, although she did not usually work Sundays. She explained that when the evening shift manager, Jeffrey Zacharias ("Jeff") came in that day, she closed out her drawers and took the money and receipts to the office. She stated that Zacharias was in the office, sitting at his computer. Scardino explained that she had her back to him when he called her name. She turned around and said that he was "standing there with his pants down to his knees * * * holding his penis in his hand." She also said that he had his shirt pulled up "above his belly a little."
 {¶ 4} Scardino testified that she told Zacharias to pull his pants up, but he wanted her to look at his penis because he had "shaved." She said that he told her to feel his testicles because they were so soft. She finally looked, thinking "maybe if I acknowledged his shaving he would pull them up and leave me alone." She testified that his penis was erect and he was rubbing it. She stated that it looked like he had "shaved like an upside down V., above his penis area all smooth. And he had hair to the outside of his — all around his penis, and his balls were very shaved and smooth."
 {¶ 5} After Scardino looked, Zacharias still did not pull his pants up. Instead, he kept grabbing her hand to try to get her to touch his penis. She *Page 4 
stated that she kept trying to pull away from him, but that he pinned her on the desk and tried to "hump" her. She explained that he kept trying to "rub [her] crotch area," but she crossed her legs so he could not do it. As a result, she said that his penis rubbed the side of her leg.
 {¶ 6} Scardino further testified that Zacharias got angry with her because she told him that her boyfriend (who was her husband at the time of the trial), Brad Resnick ("Resnick"), was working in the kitchen. At that point, she noticed Jeff on the surveillance cameras coming toward the office, so she told Zacharias that Jeff was coming and she was able to run out of the office.
 {¶ 7} When she left the office, she said she was in shock. She walked around the bar for a while and then went to her son's house for about an hour. She left there around 7:30 or 8:00 p.m., and went home. She testified that she "curled up and cried." She stated that she told Resnick the following morning. After that, she went to the police station and spoke with Officer Thomas Walker. Officer Walker asked her to retrieve her clothes that she was wearing when it happened. Later, she met with Detective Charles Gute and gave him a written statement.
 {¶ 8} Scardino explained that Detective Gute had wanted her to wear a wire and confront Zacharias, but she did not want to. She agreed to call Zacharias, however, and tape the conversation. The tape was played for the jury. In it, Scardino told Zacharias that she was upset about what had happened on Sunday when he approached her. Zacharias responded "fine," but then told her don't make any sexual innuendos or sexual comments to me. Scardino *Page 5 
replied that she never had, and Zacharias said something to the effect that she had brought a Red Bull in and was stroking the can (the tape is not entirely clear). He then told her that she had performed oral sex on him before and when she denied that she had, he said, "Brad, what's up?" He accused her of either recording the phone conversation or letting Resnick listen in on the call.
 {¶ 9} On cross-examination, she agreed that she told Detective Gute that the incident occurred between 6:00 and 6:30 p.m. She also agreed that she did not know the exact time that Zacharias left the restaurant that day.
 {¶ 10} Resnick testified that he had worked at Zach's Steakhouse on the day of the alleged incident. He remembered arriving at work around 1:00 or 2:00 p.m. that day. He said that Scardino had stopped by the "broiler where [he] was working" around 6:00 to 6:15 p.m. to tell him that she was leaving. He did not notice anything about her demeanor at that time because they were busy. He talked to her on the phone around 11:30 p.m. and she sounded "troubled." She then told him the following morning what had happened in the office with Zacharias.
 {¶ 11} On September 12, 2006, Resnick spoke with Detective Gute. While he was speaking with Detective Gute, Zacharias called Resnick and Detective Gute taped the conversation. This call was about 30 minutes after Scardino had called Zacharias and taped her conversation with him. The tape was played for the jury. Zacharias kept saying to Resnick that Scardino was "off her rocker" and "crazy." Zacharias told Resnick that Scardino grabbed his "crotch," but that it was more like she "pinched his ass." Zacharias also called Scardino a liar and *Page 6 
told Resnick that Scardino had been hitting on him three or four weeks prior to that.
 {¶ 12} Detective Gute of the Berea Police Department testified that based upon the physical description Scardino had given him of Zacharias's penis, he obtained a search warrant to photograph it. After he got the warrant, he asked Zacharias to come to the station. Zacharias told Detective Gute that Scardino had been angry with him because he had not given Resnick the following weekend off so that he could attend a wedding with her.
 {¶ 13} Detective Gute testified that Zacharias also told him that while Scardino was in his office around 5:00 p.m., she "stroked [a] glass of Pepsi, stroking it in a manner in which he described as stroking a penis." Zacharias said that Scardino had said to him, "how is red bull today[?]" Zacharias thought that she meant his penis. Zacharias further told Detective Gute that Scardino then grabbed his crotch, but Zacharias explained that "it wasn't a grab, more like a pinch of an ass."
 {¶ 14} Detective Gute testified that Zacharias denied touching Scardino and denied that he had exposed himself to her. Zacharias told Detective Gute that Scardino had hit on him recently; Scardino had asked him to teach her "figure eights on his motorcycle," and then said, "maybe we could go somewhere after." Detective Gute asked Zacharias if he had shaved his genitals and he replied, "yes, in the past and she knows that." Zacharias said that he and Scardino had discussed him shaving his genitals "in the fashion she described." Zacharias denied having sexual relations with Scardino. Detective Gute asked *Page 7 
him why he had said to Scardino on the phone that she had given him oral sex in the past. Zacharias replied that it was because he thought Resnick was listening in on the conversation.
 {¶ 15} Detective Gute photographed Zacharias's penis and then followed him to Zach's Steakhouse to photograph the office. Detective Gute identified the photos in court as the ones he took and authenticated them.
 {¶ 16} The state rested. Zacharias moved for a Crim. R. 29 motion with respect to count three only, which the trial court denied. Zacharias presented multiple witnesses to testify on his behalf.
 {¶ 17} Michael Marko testified that he was working at Zach's Steakhouse as a cook on the day of the alleged incident. He said that on that day, Scardino got very angry because Zacharias had scheduled Resnick to work the following Saturday for a wedding that she wanted Resnick to go to. Around 5:30 p.m., Marko said that Resnick grabbed the schedule and "went to the back of the restaurant." About five or ten minutes later, Marko saw Zacharias leave the restaurant. Marko said that he then saw Scardino leave, but explained that she soon returned and had a few drinks.
 {¶ 18} Jeff, the evening manager, testified that on the day of the alleged incident, he arrived at Zach's Steakhouse a couple of minutes after 5:00 p.m. On cross-examination, he said that he saw Scardino cash out around 5:15 p.m. He said that he always starts at 5:00 p.m. on Sundays. He saw her take her cash back to the office and come back with the beer cart to restock around 5:25 p.m. *Page 8 
Then he saw her ten to fifteen minutes later sitting with her friends having a drink. She ordered a round of drinks for her friends shortly before 6:00 p.m.
 {¶ 19} Four witnesses, Richard Vargo (Zacharias's uncle), Stephanie Zoller, (Zacharias's aunt), Vivian Zacharias (Zacharias's mother), and Carrie Troyan (Zacharias's girlfriend) testified that Zacharias's grandmother was taken to the emergency room and that Zacharias was at the hospital by 5:55 p.m.
 {¶ 20} Troyan further testified that she could not tell if Zacharias shaved his genitals (even after looking at the photographs), but said that she asked him and he told her that he did. She also said that Zacharias had received an email on his computer of a "blue collar tape."[1] She said that Zacharias had talked about it all evening after he received it.
 {¶ 21} Officer Walker testified that he took the complaint from Scardino. He said that no semen was found on her clothes.
 {¶ 22} Katie Bodnar testified that she used to date Zacharias. She said that she was at the restaurant one time and had seen a "blue collar video" that had been playing. It was a comedian who "was talking about a deck, but it had other innuendoes." Bodnar agreed that the video was really talking about *Page 9 
"trimming shrubs." She said Scardino came in while they were talking about it. She did not know if Scardino saw the video, but said that Scardino knew what they were talking about.
 {¶ 23} Douglas Mitchell, who also worked at the restaurant, testified that he was in the office with Zacharias on the day in question working on his schedule when Scardino came in there to do her "revenues." He said that Zacharias soon left after that to go to the hospital.
 {¶ 24} The jury returned a guilty verdict on the public indecency charge, but found Zacharias not guilty of gross sexual imposition and unlawful restraint. The trial court sentenced him to ten days in the county jail, ordered that he pay a $250 fine and costs, and then stayed the sentence pending appeal.
 {¶ 25} It is from this judgment that Zacharias appeals, raising two assignments of error for our review:
 {¶ 26} "[ 1.] The conviction of the appellant is against the manifest weight of the evidence adduced at trial.
 {¶ 27} "[2.] The trial judge erred in allowing photographs of the defendant to go to the jury where they were not shown to the complaining witness for identification during the State's case-in-chief."[2] *Page 10 
 {¶ 28} In his first assignment of error, Zacharias argues that his conviction was against the manifest weight of the evidence because he presented "uncontroverted evidence that he was elsewhere on the date and time the victim alleged the criminal conduct took place." We disagree.
 {¶ 29} In State v. Thompkins (1997), 78 Ohio St.3d 380, 387, the Supreme Court explained:
 {¶ 30} "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. * * * Weight of the evidence concerns `the inclination of thegreater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on its effect in inducing belief' (Emphasis added.)
 {¶ 31} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony. * * * `The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" (Internal citations omitted.) *Page 11 
 {¶ 32} After reviewing the entire record, weighing the evidence and all reasonable inferences, considering the credibility of witnesses, and conflicts in the evidence, we do not find that Zacharias's convictions were such that "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." See Thompkins, supra.
 {¶ 33} Zacharias is not contending that he was not in the restaurant at all that day. In fact, Zacharias's witnesses put him in the restaurant until at least 5:39 p.m., after which he left for the hospital.
 {¶ 34} Zacharias is actually arguing that Scardino was not credible. He maintains that Scardino "repeatedly testified" that the incident occurred between 6:00 and 6:30 p.m. Prior to trial, he filed a notice of alibi and then at trial, presented several witnesses who testified that he was at the hospital by 6:00 p.m. because his grandmother had been taken to the hospital.
 {¶ 35} At trial, however, Scardino testified that she worked the 10:30 to 6:00 p.m. shift on the day of the incident. That was her normal shift, although she did not normally work Sundays. She said that she closed out her drawers and went back to the office after the evening manager, Jeff, arrived. Jeff testified that he came in at 5:00 p.m. that day because it was Sunday, but that normally, during the week, he does not come in until 6:00 p.m. Thus, the jury could have reasonably determined that Scardino thought that it was 6:00 p.m. when she closed out her drawers because that is when Jeff normally arrived at work during the week to relieve her of her duties. *Page 12 
 {¶ 36} The credibility, or lack thereof, of a witness is exclusively for the trier of fact. State v. Jackson (Apr. 20, 2000), 8th Dist. No. 76141. This court will only reverse a jury's finding on a credibility assessment when we find that the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." The record in this case reveals that this was not the "exceptional case" where the evidence weighs heavily against the conviction and we should order a new trial.
 {¶ 37} Accordingly, Zacharias's first assignment of error is without merit.
 {¶ 38} In his second assignment of error, Zacharias maintains that the trial court erred in admitting the photographs of his penis because neither Detective Gute, nor the prosecutor showed the pictures to Scardino to identify them as "being accurate depictions of the genitalia of [Zacharias]." He contends that was fatal to the state's case and denied him a fair trial.[3] We disagree.
 {¶ 39} The admission of evidence, including photographic evidence, is a matter within the trial court's sound discretion. State v. Cook,149 Ohio App.3d 422, 2002-Ohio-4812, _22. "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid. R. 901(A). *Page 13 
 {¶ 40} To properly authenticate photographs, the proponent need only produce a witness with knowledge of the purported subject matter of the photographs, who, by way of foundation, can testify that the photographs represent a fair and accurate depiction of the actual item at the timethe picture was taken. State v. Bettis, 12th Dist. No. CA2004-02-034,2005-Ohio-2917, _28. It is in the province of the trier of fact to reject the authenticity of the evidence and to disbelieve the testimony of the foundational witness. State v. Brooks (1995),101 Ohio App.3d 260, 264.
 {¶ 41} Detective Gute took the photographs five days after the alleged incident; therefore, he had first hand knowledge of the subject matter of the photographs. He properly identified them as the photographs he took and properly authenticated them by testifying that the pictures depicted a fair and accurate representation of Zacharias's penis the day he took the photos. Accordingly, the trial court did not err when it overruled Zacharias's objection and admitted the photographs.
 {¶ 42} Zacharias's identity is not at issue in this case. There was no need for a photo array of penises as Zacharias absurdly suggests. Scardino testified that Zacharias's penis looked as if he had "shaved like an upside down V., above his penis area [was] all smooth." She also said that he had "hair to the outside of his — all around his penis, and his balls were very shaved and smooth." She also described Zacharias's penis to the police, which prompted Detective Gute to take the photographs. *Page 14 
 {¶ 43} The photographs clearly show an area above Zacharias's penis that had been shaved, but it was not completely "smooth" as Scardino had testified because a small amount of stubble was beginning to appear. That is entirely consistent with what Scardino testified to, since the picture was taken five days later. In addition, the photographs show, exactly as Scardino described, hair "all around" the penis, above the shaved area. Although it appears that the shaved area was more of a semi-circular design, rather than an "upside down V," the jury, as the trier of fact, was capable of making that determination itself.
 {¶ 44} Accordingly, Zacharias's second assignment of error is overruled.
 {¶ 45} The judgment of the Cuyahoga County Court of Common Pleas is affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANTHONY O. CALABRESE, JR., P.J., and MARY EILEEN KILBANE, J., CONCUR
[1] Part of Zacharias's defense appeared to be that he had received an email with an attached "blue color tape" or there was some kind of comedic DVD with "blue collar" humor on it. None of the testimony about this purported video is very clear. No one completely testifies as to what was in the video or what Zacharias did after watching the video. Apparently, it either described a deck with trimmed shrubs or showed a deck with trimmed shrubs and Zacharias supposedly shaved his pubic hair to look like the shrubs in this video. Zacharias appeared to argue at trial (again, it is not entirely clear) that was how Scardino would have known he had shaved the hair around his penis in the design that he did (even though he claims she did not see it), because everyone in the restaurant had either seen or talked about the video.
[2] In his brief, Zacharias actually raises these arguments as two issues, "A" and "B," under the heading of one assignment of error (that his conviction was against the manifest weight of the evidence). But in issue "B," he never raises a manifest weight argument with respect to the photographs. He argues that the photographs should not have been admitted and thus, he was denied a fair trial. Accordingly, we will treat this as a separate assignment of error, and not as a manifest weight argument.
[3] At trial, defense counsel initially objected to the any of these photographs being admitted. However, when the trial court ordered that some of the photos would be admitted, but not all of them (because some were duplicative), defense counsel then argued that he wanted all of the photographs in. Now, on appeal, he is again arguing that they should not have been admitted. *Page 1